# WESTERN UNION TELEGRAPH COMPANY *v.* ANN ARBOR RAILROAD COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 202. Argued and submitted March 19, 20, 1900. — Decided May 21, 1900.

When a suit does not really and substantially involve a dispute or controversy as to the effect or construction of the Constitution or laws of the United States, upon the determination of which the result depends, it is not a suit under the Constitution and laws; and it must appear on the record, by a statement in legal and logical form, such as is required in good pleading, that the suit is one which does really and substantially involve a dispute or controversy as to a right which depends on the construction of the Constitution, or some law or treaty of the United States, before jurisdiction can be maintained on this ground.

THIS was a bill filed in the Circuit Court of Benzie County, Michigan, by the Western Union Telegraph Company against the Ann Arbor Railroad Company, to restrain defendant from interfering with the rights of complainant in a certain telegraph line along defendant's railroad. The bill stated the Western Union Telegraph Company to be "a corporation organized and existing under the laws of the State of New York, and a citizen of the said State of New York," and the Ann Arbor Railroad Company to be "a corporation organized and existing under

the laws of the State of Michigan and a citizen of said State of Michigan." The bill alleged that on the 25th day of September, 1890, the Frankfort and South Eastern Railroad Company, a corporation of the State of Michigan, owned and operated a railroad from Frankfort to near Copemish, Michigan; that on that day complainant entered into a contract with the Frankfort and South Eastern Railroad Company for the construction and maintenance of a telegraph line along the entire length of its road; that in pursuance of the contract and in May, June and July, 1891, complainant built the telegraph lines provided for therein; that one wire was erected for the joint use of the railroad company and complainant, and a loop to Frankfort and back was put on the poles for the exclusive use of complainant. It was further alleged that the railroad of the Frankfort and South Eastern Railroad Company was sold some time in May, 1892, and transferred to the Toledo, Ann Arbor and North Michigan Railroad Company, a corporation organized and existing under the laws of the State of Michigan; that afterwards said last-mentioned company mortgaged their entire railroad to the Farmers' Loan and Trust Company as trustee, and said mortgage being in default a bill was filed to foreclose it in September, 1893, in the Circuit Court of the United States for the Northern District of Michigan, to which foreclosure suit complainant was not a party; that the whole road was sold under order of court and conveyed to the Ann Arbor Railroad Company, and the sale and conveyance were confirmed; that the last-mentioned company now claimed to be in possession and operating the road formerly known as the Frankfort and South Eastern Railroad. And further, that the Ann Arbor Railroad Company purchased the road with full knowledge of complainant's rights, but that it insisted that it was not bound by the contract made with the Frankfort and South Eastern Railroad Company, and had given complainant written notice to that effect.

The sixth and seventh paragraphs of the bill were as follows:

"6th. Your orator is now and long has been doing an extensive telegraph business in many parts of the United States. On January 7, 1867, it filed with the Postmaster General its accept-

ance of the provisions of the act of the United States, passed July 24, 1866.

"7th. It avers that the provisions of the contract with said Frankfort and South Eastern Railroad Company are binding on said Ann Arbor Company, and that independent of said contract it has a right to maintain its telegraph line on what was formerly said Frankfort and South Eastern Railroad under the provisions of the statute of the United States."

It was further averred that about October 1, 1895, the Ann Arbor Railroad Company took possession of complainant's wires between Thompsonville, near Copemish, and Frankfort, and cut off their connection with its other wires, and deprived complainant of telegraphic connection with Frankfort; that the value of the telegraph lines was at least the sum of $3000, and the damages arising through loss of business large but incapable of accurate calculation; that October 14, 1895, complainant reconnected the telegraph lines running from Thompsonville to Frankfort, and so again opened telegraphic communication with the latter place, and was now in full possession and use of said lines; but that complainant was justly apprehensive that, unless restrained by injunction, defendant would again seize said telegraph lines and deprive complainant of their use.

The prayer was for process and answer, "and that an injunction both preliminary and final may be issued out of and under the seal of this court, commanding the said Ann Arbor Railroad Company and all its officers and agents to absolutely desist and refrain from in any way interfering with the rights of complainant, as alleged in this bill, in the telegraph wires and poles running from Thompsonville to Frankfort, or its possession of the same, and that said defendant allow said complainant to reconnect said wires to its main line on the Chicago and West Michigan Railroad, and to use said wires for its telegraph business in the same way as it was accustomed to use them before its rights were disturbed by said defendant, and that defendant be required to carry out said contract in good faith and for such other and further or different relief, or both, as may be agreeable to equity and good conscience."

Defendant filed its petition and bond for the removal of the

cause into the Circuit Court of the United States for the Eastern District of Michigan, alleging that it was a citizen of the State of Michigan, and that complainant was a citizen of New York, and then stating: "Your petitioner further shows to the court that the matter and amount in dispute in the above entitled cause exceeds, exclusive of interest and costs, the sum and value of two thousand dollars ($2000); that this suit is one arising under the Constitution and laws of the United States, and especially under the act of Congress of July 24, 1866, now contained in section 5263 of the Revised Statutes of the United States and the amendments thereto." The cause having been removed, defendant filed an answer and cross-bill, setting up the existence of a mortgage prior to the alleged contract and its foreclosure, and other matters. Certain facts were stipulated, and the cause submitted. The Circuit Court decreed a dismissal of the bill. From this decree an appeal was taken to the Circuit Court of Appeals, and that court affirmed the decree. 61 U. S. App. 741. From the decree of the Circuit Court of Appeals the Western Union Telegraph Company appealed to this court.

*Mr. John F. Dillon* for appellant. *Mr. Rush Taggart* and *Mr. George H. Fearons* were on his brief.

No appearance for appellee.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The Western Union Telegraph Company might have instituted its suit in the Circuit Court, but it sought the state tribunals as it had the right to do, and the defendant could not remove the case on the ground of diverse citizenship, although that fact existed, because it was itself a resident of the State. Defendant's application to remove, therefore, was based on the averment that the suit arose "under the Constitution and laws of the United States." Whether it did so arise depended on complainant's statement of its own case. *Tennessee* v. *Bank,*

152 U. S. 454. And the sixth and seventh paragraphs of the bill contain all that defendant could have relied on as bringing the case within that category. These paragraphs were to the effect that complainant had accepted the provisions of the act of Congress of July 24, 1866, and that, independent of the contract, it had "a right to maintain its telegraph line on what was formerly said Frankfort and South Eastern Railroad under the provisions of the statute of the United States."

The bill was in legal effect a bill for the specific performance of the contract set up in the pleadings, and the prayer was for injunction against interference with complainant's alleged rights, and that defendant allow complainant to reconnect its said wires, and use them in the same way as before they were disturbed by defendant, "and that defendant be required to carry out said contract in good faith," and for general relief.

It was not argued by counsel for the telegraph company that the telegraph company had any right under the statute, and independently of the contract, to maintain and operate this telegraph line over the railroad company's property; and it has been long settled that that statute did not confer on telegraph companies the right to enter on private property without the consent of the owner, and erect the necessary structures for their business; "but it does provide, that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges." *Pensacola Telegraph Company* v. *Western Union Telegraph Company,* 96 U. S. 1. In that case Mr. Chief Justice Waite further said: "No question arises as to the authority of Congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of public property alone is granted. If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized."

When a suit does not really and substantially involve a dispute or controversy as to the effect or construction of the Constitution or laws of the United States, upon the determination

of which the result depends, it is not a suit arising under the Constitution or laws. And it must appear on the record, by a statement in legal and logical form, such as is required in good pleading, that the suit is one which does really and substantially involve a dispute or controversy as to a right which depends on the construction of the· Constitution or some law or treaty of the United States, before jurisdiction can be maintained on this ground. *Gold Washing & Water Co.* v. *Keyes,* 96 U. S. 199; *Blackburn* v. *Portland Gold Mining Co.,* 175 U. S. 571.

We are unable to perceive that paragraphs sixth and seventh met this requirement, and it does not appear to us that they were intended to do so by the pleader. As we have said, it was not asserted in argument that the telegraph company had the right independently of the contract to maintain its line on the railroad company's property, and in view of the settled construction of the statute, we could not permit such a contention to be recognized as the basis of jurisdiction. But it was argued that by virtue of the statute the telegraph company was possessed of a public character and was discharging public duties, and that although the interest it acquired by its contract was subject to the prior mortgage, it could not be absolutely deprived thereof by foreclosure, but that the Circuit Court should have so framed its decree as to preserve the occupancy of the telegraph company, subject to making compensation to the railroad company, the value of the alleged easement to be ascertained by the court. It is sufficient to say that the bill was not framed in that aspect, and though there was a prayer for general relief, relief cannot be awarded under that prayer unless it is such relief as is agreeable to the case made by the bill. And it is entirely clear that there were no averments in the bill in respect of this contention which would bring the case within the category of cases arising under the Constitution or laws of the United States so that jurisdiction could be held to have rested on that ground.

*The result is that the decrees of the Circuit Court of Appeals and of the Circuit Court must be reversed, and the cause be remanded to the latter court with a direction to remand it to the state court, and it is so ordered.*