**ARKANSAS–MISSOURI POWER CO. v. CITY OF KENNETT, MO., et al.**

**MISSOURI PUBLIC SERVICE CO. v. CITY OF TRENTON, MO., et al.**

Nos. 10295, 10296.

Circuit Court of Appeals, Eighth Circuit.

Aug. 15, 1935.

Rehearing Denied Oct. 9, 1935.

A. Z. Patterson, Cyrus Crane, and D. C. Chastain, all of Kansas City, Mo., for appellants.

Robert B. Fizzell, of Kansas City, Mo. (Orville Zimmerman and John T. McKay, Jr., all of Kennett, Mo., and Bowersock, Fizzell & Rhodes, of Kansas City, Mo., on the brief), for appellees city of Kennett, Mo., and others.

Henry T. Hunt, Sp. Asst. to the Atty. Gen., for Harold L. Ickes, as Federal Emergency Administrator of Public Works.

Russell N. Pickett, of Trenton, Mo. (Harry J. Fair, of Trenton, Mo., on the brief), for appellees city of Trenton, Mo., and others.

Henry T. Hunt, Sp. Asst. to the Atty. Gen. (Cyrus B. Austin, of Boston, Mass., Legal Division, Federal Emergency Administration of Public Works, on the brief), for Harold L. Ickes, as Federal Emergency Administrator of Public Works, amicus curiæ.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

These cases, which arise out of substantially similar circumstances, were argued together. Each was a suit in equity for an injunction. A decree dismissing the appellant's bill for want of equity was entered in each suit, and these appeals followed. The parties will be designated as in the courts below.

The Arkansas-Missouri Power Company is an Arkansas corporation. It owns and operates electric plants and distribution systems in southeastern Missouri and northeastern Arkansas. It has such a plant and system in the city of Kennett, Mo., a city of the third class under the Missouri classification; and is and has been engaged in furnishing electrical service to the inhabitants of that city, under a valid, but nonexclusive, franchise. (It is so alleged in the complaint, which must be taken as true.) The company is also a taxpayer of the city. In 1933 the city voted to issue $140,000 of bonds to provide funds for the purpose of erecting and purchasing a municipal electric plant. It then applied to the Federal Emergency Administration of Public Works (hereinafter called P. W. A.) for funds of the United States to build the plant. P. W. A. agreed to loan the city $120,000, by purchasing $120,000 of its bonds, and, in addition, to grant to the city an amount not to exceed 30 per cent. of the cost of the labor and materials used upon the project. The loan agreement between the city and the United States was reduced to writing. The power company then brought its suit against the city and its officers to enjoin them from erecting a municipal plant with the funds to be obtained from the government under the loan agreement, and also to enjoin defendant Ickes, as Administrator of P. W. A., from making the loan to the city.

The plaintiff applied for a preliminary injunction, and the defendants moved to dismiss the complaint for want of equity. The motions to dismiss were sustained.

The Missouri Public Service Company is a Missouri corporation; the city of Trenton is a city of the third class, like the city of Kennett. The service company has an electric plant and distribution system in that city and is a taxpayer. It has no exclusive franchise. Like the city of Kennett, the city of Trenton voted to issue bonds for the purpose of erecting and operating a municipal electric plant. It made an application to P. W. A. for a loan and grant. Its application was approved. A loan agreement substantially similar to that of the city of Kennett was executed. The service company then sought to enjoin the city and its officers from building the plant with government funds, and to enjoin Ickes, Administrator, from furnishing funds as provided in the agreement. The defendants answered. The suit was tried. The court made findings of fact and conclusions of law, and entered a decree dismissing the complaint.

There is no substantial difference between the two cases upon the facts, and the same general rules of law are applicable to each. It will be noted, however, that in the suit involving the city of Kennett, diversity of citizenship was present, while in the city of Trenton suit both the plaintiff and the defendants, with the exception of Ickes, were citizens of Missouri.

### No. 10295.

We shall first consider the case involving the city of Kennett. The right of Kennett to own and operate an electric plant in competition with the Arkansas-Missouri Power Company is conceded, as is its right to issue bonds for that purpose. The proceedings leading up to the authorization of the bond issue are not seriously questioned. Reduced to their simplest terms, the contentions of the power company are that the city, in proceeding to enter into competition with it, is doing a lawful thing in an unlawful way, and that the United States, in loaning the city money to be used in building a municipal plant, is doing that which it has no right to do.

The court below was of the opinion that the power company was in no position to question the power of the federal government to loan or give money to the city of Kennett. We are in accord. The United States is not proposing to become a competitor of the power company. It will have no right, title, or interest in the plant when completed and nothing to do with operating it. The destruction of the power company's property will come about by reason of the city's operation of the plant when erected. The position of the United States is that of a lender of money, a buyer of bonds, and a giver of gifts. True, the money procured from the government will enable the city to build the plant, and, if the city builds the plant, it will no doubt operate it, and when it does operate the plant the city will take the customers of the power company, and the company's property in Kennett will become worthless or greatly impaired in value. We know of no rule of law, however, which permits one indirectly hurt, no matter how seriously, by a government expenditure, to question the power of the government to make it. In fact, the rule is to the contrary. Commonwealth of Massachusetts v. Mellon, Secretary of the Treasury et al., 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078; City of Allegan, Mich., v. Consumers' Power Co. (C. C. A. 6) 71 F.(2d) 477 (certiorari denied, 293 U. S. 586, 55 S. Ct. 100, 79 L. Ed. —). It is true that in the cases cited the plaintiffs relied upon their status as taxpayers exclusively, while in this case the plaintiff relies, in addition, upon the injury which will be done to its property by municipal competition. That injury, however, is, so far as the government is concerned, clearly consequential and indirect, as we have pointed out. See, also, Missouri Utilities Co. v. City of California, Mo., et al. (D. C., W. D. Mo.) 8 F. Supp. 454, 465.

Since the power company may not question the right of the United States to loan or grant funds to the city as proposed, we need only determine whether the city is proceeding lawfully to secure funds to enable it to build and operate its municipal plant. If it is proceeding lawfully, the mere fact that the power company's property will be injured or destroyed, resulting in the impairment of the investments of those who furnished money to it in the belief that their investments would not be lost through the unnecessary duplication of the company's plants, is of no legal consequence. On the other hand, if the city is proceeding unlawfully, then the power company may invoke the rule of law which protects the owner of a franchise or permit, although it be nonexclusive, against the illegal acts of others who propose to exercise the privilege conferred by the franchise. City of Campbell, Mo., et al. v. Arkansas-Missouri Power Co. (C. C. A. 8) 55 F.(2d) 560; Iowa Southern Utilities Co. v. Cassill, Mayor et al. (C. C. A. 8) 69 F.(2d) 703; Frost v. Corporation Commission of Oklahoma et al., 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483.

Under this rule, the power company may, we think, question the right of the city to enter into this contract with the government. Conditions imposed upon the city by the government under parts three and four of the loan agreement, which are set out in full in the footnote,[1] it is insisted, make the agreement one which

---

[1] Part Three.

Construction Contracts.

*In Consideration Of The Grant, The Borrower Covenants That:*

1. *Construction Contracts.* All construction contracts made by the Borrower and all subcontracts for work on the Project shall be subject to the rules and regulations adopted by the Government to carry out the purposes and control the administration of the Act, and shall contain provisions appropriate to insure that:

(a) *Convict Labor.* No convict labor

the city may not lawfully enter into in securing funds. This, because the city has attempted to delegate to the government legislative authority which may not be delegated.

█ This court, in construing the loan agreement and in determining the power of the city to make it, is, of course, bound by the law of Missouri as interpreted by the courts of that state. Geor-

shall be employed on the project, and no materials manufactured or produced by convict labor shall be used on the project.

(b) *30-Hour Week*. Except in executive, administrative and supervisory positions, so far as practicable and feasible in the judgment of the Government, no individual directly employed on the Project shall be permitted to work more than thirty hours in any one week, or, except in cases of emergency, on any Sundays or legal holidays; but in accordance with rules and regulations from time to time made by the Government, this provision shall be construed to permit working time lost because of inclement weather or unavoidable delays in any one week to be made up in the succeeding twenty days.

(c) *Wages*.

(1) All employees shall be paid just and reasonable wages which shall be compensation sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort;

(2) All contracts and subcontracts shall further prescribe such minimum wage rates for skilled and unskilled labor as may be determined by the Government and shall be subject to all rules and regulations which the Government may promulgate in connection therewith. Such minimum rates, if any, shall also be stated in all proposals of bids submitted including those of subcontractors; and a clearly legible statement of all wage rates to be paid the several classes of labor employed on the work shall be posted in a prominent and easily accessible place at the site of the work. All contractors shall keep a true and accurate record of the hours worked by and the wages paid to each employee and shall furnish the Government with sworn statements thereof on demand.

(3) All employees shall be paid in full not less often than once each week and in lawful money of the United States of America in the full amount accrued to each individual at the time of closing of the pay roll, which shall be at the latest date practicable prior to the date of payment, and there shall be no deductions on account of goods purchased, rent, or other obligations, but such obligations shall be subject to collection only by legal process.

(d) *Labor Preferences*. Preference shall be given, where they are qualified, to ex-service men with dependents, and then in the following order:

(1) To citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the City of Kennett and/or County of Dunklin in the State of Missouri and,

(2) To citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the State of Missouri, provided, that these preferences shall apply only where such labor is available and qualified to perform the work to which the employment relates.

(e) *Employment Services*. To the fullest extent possible, labor required for the Project and appropriate to be secured through employment services, shall be chosen from lists of qualified workers submitted by local employment agencies designated by the United States Employment Service, provided however, that organized labor, skilled and unskilled, shall not be required to register at such local employment agencies but shall be secured in the customary ways through recognized union locals. In the event, however, that qualified workers are not furnished by the union locals within 48 hours (Sundays and holidays excluded) after request is filed by the employer, such labor may be chosen from lists of qualified workers submitted by local employment agencies designated by the United States Employment Service. In the selection of workers from lists prepared by such employment agencies and union locals, the labor preferences provided in Sub-Paragraph (d) *supra*, shall be observed in accordance with such rules and regulations as the Government may prescribe.

(f) *Human Labor*. In accordance with such rules and regulations as the Government may prescribe, the maximum of human labor shall be used in lieu of machinery wherever practicable and consistent with sound economy and public advantage; and to the extent that the work may be accomplished at no greater expense by human labor than by the use of machinery, and labor of requisite qualifications is available, such human labor shall be employed.

(g) *Accident Prevention*. Every construction contract for work on the Project shall contain an undertaking to comply with all applicable provisions of the laws and building and construction codes of the State, Territory, District and/or

gia Railway & Power Co. et al. v. Town of Decatur, 262 U. S. 432, 438, 43 S. Ct. 613, 67 L. Ed. 1065; Old Colony Trust Company v. City of Omaha, 230 U. S. 100, 116, 33 S. Ct. 967, 57 L. Ed. 1410; Claiborne County v. Brooks, 111 U. S. 400, 410, 411, 4 S. Ct. 489, 28 L. Ed. 470. The agreement, by its terms, is to be construed in accordance with the laws of Missouri.

municipality in which the work is done and with any regulations for the protection of workers which may be promulgated by the Government.

(h) *Compensation Insurance.* Every construction contract for work on the Project shall contain a provision requiring the employer to furnish compensation insurance for injured workers and to give proof of such adequate insurance satisfactory to the Government.

(i) *Persons Entitled to Benefits of Labor Provisions.* Every person who performs the work of a laborer or of a mechanic on the Project, or any part thereof, shall be entitled to the benefits of the labor and wage provisions hereof, regardless of any contractual relationship between the contractor or subcontractor and such laborer or mechanic. There shall be no discrimination in the selection of labor on the ground of race, creed or color.

(j) *Bonding of Contracts.* Construction contracts shall be supported by adequate surety or other bonds or security satisfactory to the Government for the protection of labor and material men employed on the Project or any part thereof.

(k) *Materials.* So far as articles, materials, and supplies produced in the United States are concerned, only articles, materials and supplies produced under codes of fair competition adopted pursuant to the provisions of Title I of the Act, or under the President's Re-employment Agreement, shall be used in work on the Project, except when the Government determines that this requirement is not in the public interest or that the consequent cost is unreasonable. So far as feasible and practicable, and subject to the above, preference shall be given to the use of locally produced materials if such use does not involve higher cost, inferior quality or insufficient quantity, subject to the determination of the Government; but there shall be no requirement providing price differentiations for or restricting the use of materials to those produced within the Nation or State.

(l) *Inspection of Records.* The Government, through its authorized agents shall have the right to inspect all work as it progresses and shall have access to all pay rolls, records of personnel, invoices of materials, and other data relevant to the performance of the contract.

(m) *Reports.* Subject to such rules and regulations as the Government may prescribe, contractors and subcontractors shall make reports in triplicate to the Government monthly within five days after the close of each calendar month on forms to be furnished by the United States Department of Labor, which reports shall include the number of persons on their pay rolls, the aggregate amount of the pay rolls, the man hours worked, wage scales paid to various classes of labor and the total expenditures for materials. The contractors shall also furnish to the Government the names and addresses of all subcontractors at the earliest date practicable.

(n) *Compliance with Title I of the Act.* All contractors and subcontractors must comply with the conditions prescribed in Sections 7 (a) (1) and 7 (a) (2) of Title I of the Act.

2. *Restriction as to Contractors.* No contract shall be let to any contractor or subcontractor who has not signed and complied with the applicable approved code of fair competition adopted under Title I of the Act for the trade or industry or subdivision thereof concerned, or, if there be no such approved code, who has not signed and complied with the provisions of the President's Re-employment Agreement.

3. *Termination for Breach.* The Borrower will enforce compliance with all the provisions of this part of this Agreement, and, as to any work done by it in connection with the construction of the Project, will itself comply therewith. All construction contracts shall provide that if any such provisions are violated by any contractor or subcontractor, the Borrower may, with the approval of the Government, and shall at the request of the Government, terminate by written notice to the contractor or subcontractor the contract of such contractor or subcontractor, and have the right to take over the work and prosecute the same to completion by contract or otherwise and such contractor or subcontractor and his sureties shall be liable for any excess cost occasioned thereby and/or, if so requested by the Government, the Borrower shall withhold from such contractor or subcontractor so much of the compensation due to him as may be necessary to pay to laborers or mechanics the difference between the rate of wages required by the contract and the rate of wages actually paid to the laborers and mechanics.

■ There is no Missouri statute authorizing municipalities to enter into contracts such as the one here involved. There is no decision of any of the state courts of Missouri holding that such a contract may or may not lawfully be entered into by a municipality. In order to determine whether the contract is valid, we must turn to those decisions of the courts of Missouri relating to the delegation

---

4. *Force Labor.* Provided, however, that if prices in the bids are excessive, the Borrower reserves the right, anything in this Agreement to the contrary notwithstanding, to apply to the Government for permission to do all or any part of the Project by day labor, upon such conditions as the Government may impose, with the understanding that all provisions in this Agreement, including those relating to labor, wages, hours and recruitment, shall be observed.

### Part Four.

1. *Construction of Project.* Upon receiving a Bond payment under the provisions of Paragraph 4, Part Two, hereof, the Borrower will promptly commence or cause to be commenced the construction of the Project (unless such construction has already been commenced), and the Borrower will thereafter continue such construction or cause it to be continued to completion with all practicable dispatch, in an efficient and economical manner, at a reasonable cost, and in accordance with the provisions of this Agreement as to the labor and materials to be employed upon the Project, and the plans, drawings, specifications and construction contracts which, except for subcontracts, shall be in form satisfactory to the Engineering Division, and in accordance with such engineering supervision and inspection as the Government or its representatives may require. Except with the prior written consent of Counsel for the Government, no materials or equipment for the Project shall, be purchased by the Borrower subject to any chattel mortgage or any conditional sale or title retention agreement.

2. *Completion of Project.* Upon the completion of the Project the Borrower will furnish to the Government a certificate of the Borrower's engineers certifying to such completion, to the total cost of the Project and to such other matters as the Engineering Division may request, such certificate to be accompanied by such data as the Engineering Division may request.

3. *Information.* During the construction of the Project the Borrower will furnish to the Government all such information and data as the Engineering Division may request as to the construction, cost and progress of the work. The Borrower will furnish to the Government and to any purchaser from the Government of 25 per centum of the Bonds, such financial statements and other information and data relating to the Borrower and the Project as the Finance Division or any such purchaser from time to time may reasonably require.

4. *Conditions Precedent to the Government's Obligations.* The Government shall be under no obligation to pay for any of the Bonds or to make any Grant:

(a) *Budget.* If in the judgment of the Federal Emergency Administrator of Public Works (hereinafter called the "Administrator") the Borrower has failed to balance its budget satisfactorily, or has failed to take satisfactory action which is reasonably designed to bring the ordinary current expenditures of the Borrower within the prudently estimated revenues thereof;

(b) *Cost of Project.* If the Engineering Division shall not be satisfied that the Borrower will be able to construct the Project within the cost estimated at the time when the Application was approved by the Government, such estimated cost being the amount of $150,000, unless, in the event that additional funds appear to the Engineering Division to be necessary in order to pay in full the cost of the construction of the Project, the Finance Division shall be satisfied that the Borrower will be able to obtain such funds, as needed, through additional borrowing or otherwise, in a manner satisfactory to Counsel for the Government;

(c) *Compliance.* If the Borrower shall not have complied, to the satisfaction of Counsel for the Government, with all the provisions contained or referred to in this Agreement and in the proceedings authorizing the issuance of the Bonds, theretofore to be complied with by the Borrower;

(d) *Legal Matters.* If Counsel for the Government shall not be satisfied as to all legal matters and proceedings affecting the Bonds, the security therefor or the Project;

(e) *Representations.* If any representation made by the Borrower in this Agreement or in the Application or in any supplement thereto or amendment thereof, or in any document submitted to the Government by the Borrower shall be found by Counsel for the Government to be incorrect or incomplete in any material respect;

(f) *Financial Condition.* If, in the judgment of the Finance Division, the financial condition of the Borrower shall have

of authority by municipalities. In this connection, it may not be inappropriate to point out that, while the Supreme Court of a state may overrule or modify its former decisions and thus change an existing rule of law, this court cannot do otherwise than apply the law of the state as at present established by the decisions of its courts.

Turning, then, to the Missouri cases:

In Matthews v. City of Alexandria, 68 Mo. 115, 30 Am. Rep. 776, the city of Alexandria had entered into a con-

changed unfavorably in a material degree from its condition as theretofore represented to the Government.

5. *Representations and Warranties.* The Borrower represents and warrants as follows:

(a) *Authorizations.* All necessary authorizations, permits, licenses and approvals from Federal, State, county, municipal and other authorities in connection with the Project or the Bonds have been or will be obtained;

(b) *Litigation.* No litigation or other proceedings are now pending or threatened which might adversely affect the Bonds, the construction and operation of the Project, or the financial condition of the Borrower;

(c) *Financial Condition.* The character of the assets and the financial condition of the Borrower are as favorable as at the date of the Borrower's most recent financial statement, furnished to the Government as a part of the Application, and there have been no changes in the character of its assets or in its financial condition except such changes as are necessary and incidental to the ordinary and usual conduct of the Borrower's affairs;

(d) *Fees and Commissions.* No fee or commission has been or will be paid by the Borrower or any of its officers, employees, agents or representatives, and no agreement to pay a fee or commission has been or will be entered into by or on behalf of the Borrower, or any of its officers, employees, agents or representatives, in order to secure the loan and/or Grant hereunder;

(e) *Affirmation.* Every statement contained in this Agreement, in the Borrower's Application, and in any supplement thereto or amendment thereof, and in any other document submitted or to be submitted to the Government by or on behalf of the Borrower is, or when so submitted will be, correct and complete, and no relevant fact materially affecting the Bonds, the Grant, the Project or the obligations of the Borrower under this Agreement has been or will be omitted therefrom.

6. *Indemnification.* The Borrower will indemnify the Government and all purchasers of the Bonds from the Government against any loss or liability incurred by reason of any inaccuracy or incompleteness in any representation con-

tained herein. In the event that there shall be any such inaccuracy or incompleteness, the Government shall be entitled (in addition to the above right of indemnification and any other right or remedy) to return any or all of the Bonds to the Borrower and recover the price paid therefor by the Government.

7. *Use of Government's Name.* Without the prior written consent of the Government, the Borrower will not refer to this Agreement or to any purchase by the Government of the Bonds as an inducement for the purchase of any securities (including Bonds repurchased from the Government) of the Borrower; and will not permit any purchaser from it of any such securities to do so.

8. *Sale of Bonds by the Government.* The Borrower will take all such steps as the Government may reasonably request to aid in the sale by the Government of any or all of the Bonds. Upon request, the Borrower will furnish to the Government or to any purchaser from the Government of 25 per centum of the Bonds, information for the preparation of a bond circular in customary form, signed by the proper official of the Borrower, containing such data as the Government or such purchaser may reasonably request concerning the Borrower and the Project.

9. *Expenses.* The Borrower will pay all costs, charges and expenses incident to compliance with all the duties and obligations of the Borrower under this Agreement including, without limiting the generality of the foregoing, the cost of preparing, executing and delivering the Bonds and obtaining all legal opinions requested by Counsel for the Government.

10. *Supplemental Documents.* The Borrower will furnish to the Government such supplemental documents as Counsel for the Government may request in connection with the Bonds, the Grant, the Project or the obligations of the Borrower under this Agreement.

11. *Waiver.* Any provision of this Agreement may be waived or amended with the consent of the Borrower and the written approval of the Engineering Division, Finance Division, and Counsel for the Government, without the execution of a new or supplemental agreement, if, in the opinion of Counsel for the Government, which shall be conclusive, such waiver or amendment does not

tract leasing a wharf to one Maxwell in payment of certain of the city's bonds held by Maxwell as consideration for building the wharf. The contract gave Maxwell the right to fix the wharfage and collect the revenue for himself for the succeeding twenty years. The bonds were allegedly assigned to the plaintiff Matthews by Maxwell. In holding that the lease contract was void and that Mat-

substantially vary the terms of this Agreement. No waiver by the Government of any such provision shall constitute a waiver thereof as applied to any subsequent obligation of the Borrower or the Government under this Agreement.

12. *Agreement Not for the Benefit of Third Parties.* This Agreement is not for the benefit of any person or corporation other than the parties hereto, their respective assigns or the successors of the Borrower, and neither the holder of the Bonds nor any other person or corporation, except the parties hereto, their respective assigns or the successors of the Borrower, shall have any rights or interest in or under this Agreement, except as expressly provided for herein.

13. *Interest of Member of Congress.* No Member of or Delegate to the Congress of the United States of America shall be admitted to any share or part of this Agreement, or to any benefit to arise thereupon.

14. *Validation.* The Borrower hereby covenants that it will institute, prosecute and carry to completion insofar as it may be within the power of the Borrower, any and all acts and things to be performed or done to secure the enactment of legislation or to accomplish such other proceedings, judicial or otherwise, as may be necessary, appropriate or advisable to empower the Borrower to issue the Bonds and to remedy any defects, illegalities and irregularities in the proceedings of the Borrower relative to the issuance of the Bonds and to validate the same after the issuance thereof to the Government, if in the judgment of Counsel for the Government such action may be deemed necessary, appropriate or advisable. The Borrower further covenants that it will procure and furnish to the Government, as a condition precedent to the Government's obligations hereunder, a letter from the Governor of the State of Missouri in form satisfactory to Counsel for the Government and expressing the covenant and agreement of said Governor to effectuate insofar as it is within his power the covenant of the Borrower as hereinabove in this Paragraph expressed.

15. *Miscellaneous.* This Agreement shall be binding upon the parties hereto when a copy thereof, duly executed by the Borrower and the Government, shall have been received by the Borrower. This Agreement shall be governed by and be construed in accordance with the laws of the State of Missouri. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective assigns and the successors of the Borrower, and shall inure to the benefit of the holders from time to time of any of the Bonds; provided, however, that no rights of the Borrower hereunder shall be assignable except with the prior written consent of the Government. All obligations of the Borrower hereunder shall cease upon payment in full of all the Bonds.

16. *Promotion of National Recovery.* The Borrower covenants to discharge faithfully and with all possible dispatch the duties and obligations imposed upon it by this Agreement, it being the purpose of this Agreement to enable the Borrower to secure the benefits of the Act, foster employment, promote the public welfare and thereby assist in the recovery program of the President of the United States.

17. *Undue Delay by the Borrower.* The Government shall have the right to rescind the allotment for the Project and annul any obligation to make a loan or a grant to the Borrower unless the Borrower shall within a reasonable time:

(a) Sign and return to the Government three counterparts of this Agreement as provided in Paragraphs 1 and 2, Part Two, hereof. (For the purposes of this subparagraph (17) (a) a reasonable time shall be deemed to be ten days in the ordinary course of events or such longer period as shall be allowed in the absolute discretion of the Administrator);

(b) Comply with all the provisions of Paragraph 2, Part Two, hereof, including particularly subparagraph (c) relating to the authorization and issuance of the Bonds;

(c) File requisitions with the Government in accordance with the provisions of Paragraphs 3 and 5, Part Two, hereof; and

(d) Commence or cause to be commenced the construction of the Project.

The Administrator shall determine in this absolute discretion what constitutes a reasonable time within the meaning of this Paragraph 17.

18. *Naming of Project.* The Project shall not be named except with the written consent of the Administrator.

19. *Construction of Agreement.* If any provision of this Agreement shall be in-

thews was entitled to recover on the bonds, the court said (68 Mo. 115, page 119, 30 Am. Rep. 776): "The principal question presented for our determination is, whether the contract of November 5th, 1867, between Maxwell and the city is valid. It is well settled by judicial decisions in this State, and elsewhere, that the legislative powers of a municipal corporation cannot be delegated to others. Such powers are in the nature of public trusts conferred upon the legislative assembly of the corporation for the public benefit, and cannot be vicariously exercised. Cooley, Con. Lim., 204, 205; City of St. Louis v. Clemens, 43 Mo. [395], 403; City of St. Louis v. Clemens, 52 Mo. [133], 138. By the charter of the city of Alexandria, authority was conferred upon the city council to erect, repair and regulate public wharves and docks, and to fix the rate of wharfage thereat. Acts 1849, 352; Acts 1851, 393. No authority was given by the charter to the city to lease the wharf, or farm out its revenues, or to empower any one else to fix the rates of wharfage. All these things were attempted to be done by the contract under consideration, and being wholly unauthorized, the contract was illegal and void. The legislative authority of the city could not be delegated, nor could the city abdicate its control over the public property held in trust by it for the benefit of the public."

In Ruggles et al. v. Collier et al., 43 Mo. 353, it was held that the section of an ordinance of the city of St. Louis authorizing the mayor to cause the streets within a certain district to be repaved with wooden pavement "wherever and whenever he shall deem it necessary," was an unlawful delegation of legislative authority, where the charter provided that "in those cases where the city council shall deem it necessary * * * the city council shall cause such repaving to be done in the manner, prescribed by ordinance." The court there said (43 Mo. 353, pages 365, 366):

"There is a clear distinction to be observed between legislative and ministerial powers. The former cannot be delegated; the latter may. Legislative power implies

judgment and discretion upon the part of those who exercise it, and a special confidence and trust upon the part of those who confer it. * * *

"The nineteenth section of the ordinance is not only violative of the express and positive language of the statute, but it defeats the whole policy which was a primary consideration in its passage. That exercise of judgment, discretion, and care, which the persons most deeply interested had a right to expect on the part of those to whom they committed their important trust, perhaps on account of their peculiar fitness, is absolved and shifted, and placed in the mere discretion of a city officer."

In City of St. Louis, to Use of Bernard Murphy, v. James Clemens, Jr., et al., 43 Mo. 395, it was held that an ordinance of the city of St. Louis authorizing the construction of a sewer "of such dimensions and of such materials as may be deemed requisite by the city engineer" was invalid as an improper delegation of power to the engineer. The St. Louis charter provided that the dimensions of sewers should be prescribed by ordinance. The court said (43 Mo. 395, page 403): "The council took no action as to the dimensions of the sewer, but left the whole matter to the discretion of the engineer. The power was vested in the counsel for some purpose, we must suppose, and they had no power to delegate it. The council act under a sense of official responsibility, and are chosen on account of their fitness for the trust reposed in them, and their constituents have a right to require them to come up to the full measure of their duties. The law requires them to act not only in view of their direct responsibility to those who elected them, but also that they should exercise their united wisdom for the general good of the public. They cannot delegate a duty plainly and expressly devolved upon them to the mere discretion, and perhaps caprice, of a single individual."

In Haag v. Ward et al., 186 Mo. 325, 85 S. W. 391, it was contended that the section of a sidewalk ordinance providing that where areas or vaults had

---

valid in whole or in part, to the extent that it is not invalid it shall be valid and effective and no such invalidity shall affect, in whole or in part, the validity and effectiveness of any other provision of this

Agreement or the rights or obligations of the parties hereto, provided, in the opinion of Counsel for the Government, the Agreement does not then violate the terms of the Act.

not been roofed over by arches of safe and durable construction, such arching as was found necessary should be installed by the contractor under plans to be furnished and approved by the city engineer, was void under the Kansas City charter provision requiring the ordinance authorizing the work to state the dimensions, materials and mode of construction. The court, in sustaining that contention, said (186 Mo. 325, 85 S. W. 391, 397, page 397): "Section 2 of the ordinance is justly obnoxious to the objections urged against it, and is clearly illegal. The common council could not delegate such power to the city engineer."

In Gratz et al. v. City of Kirkwood et al., 182 Mo. App. 581, 166 S. W. 319, the ordinance providing for a street improvement was held sufficiently specific as to line, grade, plan, form, and dimension of the work, but it was provided in section 16 of the ordinance that a street and alley committee, composed of three members of the Board of Aldermen, might make alterations in the line, grade, plan, form or dimensions, either before or after commencement of the work. In holding that section void, the court said (182 Mo. App. 581, 166 S. W. 319, pages 323, 324): "It is true that it devolves upon the city authorities to determine upon definite plans and specifications for the proposed work, in order to impart definite information to prospective bidders respecting the improvement, and prevent favoritism and corrupt practices, and in order, as well, that property owners may have an opportunity to arrest the proceedings by a protest against it in the manner provided by the statute. * * * But we think that the proceedings here in question were not rendered invalid, and the tax bill void, by reason alone of the presence of section 16 in Ordinance No. 572, supra. It is true that that section attempts to authorize changes to be made after the plans and specifications have been adopted, and public notice given of them, and even after the letting of the contract. For this reason it is in plain violation of the mandatory provisions of the statute. Furthermore, this section is void because the board of aldermen thereby attempted to delegate to a committee the power conferred upon them by statute."

In The National Water Works Company of New York v. Kansas City, 20 Mo. App. 237, the Kansas City Court of Appeals held that Kansas City, under a charter provision authorizing it to regulate grades, and a subsequent statute authorizing it to contract for water works "on such terms and conditions as might be agreed upon," could not, by contract with the plaintiff, give up the right to change the grade of streets upon which the plaintiff had laid its pipes. The court said (20 Mo. App. 237, page 242): "The grant of powers to a municipal corporation must be strictly construed. Cooley's Constitutional Limitations (star paging) 195. A legislative power granted to a municipal corporation cannot be parted with unless such was the clear intent of the legislature, for it will never be presumed that the legislature, having granted the power, has at the same time authorized a surrender of it. The authority to surrender the power must appear from 'the clear letter of the law.'"

In Neill v. Gates, 152 Mo. 585, 54 S. W. 460, it was held that a contract between the city and the contractor building a sewer, which gave to the city engineer the power to annul the contract upon failure of the contractor to comply with its terms, was an unlawful delegation of authority. The court said (152 Mo. 585, 54 S. W. 460, page 462): "While the city, by virtue of the legislative powers conferred upon it by the city charter, has the power and authority to establish sewers in the city, and to provide plans and means for their construction, the city could not delegate such powers; they being legislative, and implying judgment and discretion, to any person or persons, by contract or otherwise. Nor could the city have terminated the contract in question, in the absence of a provision in the contract authorizing it to do so. Besides, such power could no more be delegated to the city engineer than could the power to establish the sewer."

In City of St. Louis, to Use of James Creamer, v. Clemens, 52 Mo. 133, it was held that an ordinance directing the establishment of certain sewers of dimensions and materials to be determined by the city engineer was a wrongful delegation of authority, where the St. Louis charter required that the dimensions of sewers should be prescribed by ordinance.

In Thomson v. Mayor, Councilmen and Citizens of the City of Boonville, 61 Mo.

282, the council's appointment of three of its members to determine a grade and direct the grading was held to be an unlawful delegation of a power vested in the mayor and councilmen.

In City of Rich Hill v. Donnan, 82 Mo. App. 386, a city engineer's delegation of his statutory duty to estimate the cost of certain public improvements, to another, was held unlawful.

In Whitworth v. Webb City, 204 Mo. 579, 103 S. W. 86, the Missouri Supreme Court held an ordinance prescribing the general course of a sewer by streets and points of location through which the sewer was to pass, and requiring that the sewer be built of ten and twelve-inch pipe laid at an average depth of four feet, valid as sufficiently fixing the location, dimensions, and material, though the city engineer was given authority to supervise the details. The rule that legislative powers cannot be delegated and that the location of sewers is a legislative duty was reaffirmed.

■ As we read these cases, the legislative body of a Missouri municipality is without power to delegate any authority or duty requiring an exercise of discretion vested in such body, and any contract whereby legislative authority or duty is attempted to be delegated by a city is absolutely null and void.

■ The authority to build and operate municipal electric plants is granted to cities such as Kennett by Revised Statutes of Missouri 1929, §§ 6815 and 7641 (Mo. St. Ann. §§ 6815, 7641, pp. 5625, 6030), which, so far as here material, provide:

Section 6815. "The council shall have the right, also, to erect, maintain and operate gas works, electric light works or light works of any other kind or name. * * *"

Section 7641. "The city council of any city, town or village in this state shall have power * * * to erect, purchase, acquire, maintain and operate gas and power plants, electric light plants, ice plants or any other kind of plant or device for lighting purposes. * * *"

Revised Statutes of Missouri 1929, § 2962 (Mo. St. Ann. § 2962, p. 1827), provides that "no * * * city * * * or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law. * * *"

The building of an electric light plant obviously requires the exercise of judgment and discretion. Into the actual construction of such a plant, two things enter—labor and material. The selection of the labor and material to be used in erecting the plant requires the use of judgment. The duty to exercise that judgment is imposed upon the council of the city. We think that it may not contract that duty away or share it with others. That does not mean that it may not have plans and specifications prepared by architects and engineers, or that, when such plans have been finally approved by it, it may not let a general contract for the doing of the work and the furnishing of materials. It does mean that in selling its bonds or otherwise financing the project, it may not delegate to the person who furnishes the money any substantial discretion with respect to the selection of labor or material to be furnished, or share with that person the authority to direct and control the construction. Were it not for the fact that the United States is financing the project, we do not believe it would even be suggested that a city could enter into any such arrangement with a lender of money, a buyer of bonds, or even a giver of gifts. The government, in lending its money and making its grant to the city of Kennett, is not acting in the capacity of a sovereign. The city derives none of its powers from the United States. It is a creature of the state of Missouri and has only such powers as the state has given it. The relation of the United States to the city is no different than would be the relation to it of any individual, corporation, foreign state, or foreign sovereignty which had made a similar arrangement for financing the city with respect to the construction of public works. If the city could lawfully enter into this agreement with the United States, we think it could lawfully have entered into a similar agreement with any entity having power to contract.

The portions of the loan agreement set out in the footnote indicate to what extent the city has attempted to delegate to and to share with the government the exercise of the city's authority and control over the construction of the municipal plant.

Speaking generally of the agreement —the government, under paragraph 1 of part three, has the right to regulate the terms of the construction contracts. In that connection, under subparagraph (b) of paragraph 1, it retains some control over the operation of the 30-hour week provision; and, under (c), over wages to be paid, "which shall be compensation sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort." Also, under (c), the provisions of construction contracts as to minimum wage rates are to be determined by the government, and to be subject to its rules and regulations. Under subparagraph (e), the government retains some control over the selection of laborers; and, under (f), over the amount of human labor to be used in lieu of machinery. Under (h), compensation insurance furnished by contractors must be satisfactory to the government. Under (j), contractors' bonds shall be satisfactory to the government. Under (k), materials used must be those produced under codes of fair competition adopted pursuant to title 1 of the act (National Industrial Recovery Act, 48 Stat. 195 [15 USCA § 701 et seq.]) or under the President's Re-employment Agreement, except "when the Government determines that this requirement is not in the public interest or that the consequent cost is unreasonable." The extent to which local materials shall be used rests with the government, although a preference is provided for. This discretion delegated to the government is in apparent violation of Revised Statutes of Missouri 1929, §§ 13320 and 13748 (Mo. St. Ann. §§ 13320, 13748, pp. 5171, 6521), relating to the use of local materials. Under a subsequent paragraph, 3, the government may require the termination of a construction contract for a breach of a provision of the loan agreement, and, under paragraph 4 following it, in case of such termination, may permit the city to do all or any part of the work by day labor, "upon such conditions as the Government may impose." Paragraph 1 of part four provides that plans, drawings, specifications, and construction contracts shall be in form satisfactory to the Engineering Division of P. W. A., that the work shall be done in accordance with such engineering supervision and inspection as the government may require, and that no materials or equipment shall be purchased by the city subject to any chattel mortgage or conditional sale or title retention agreement, without the consent of counsel for the government.

While the government, under this loan agreement, does not relieve the city of all responsibility in connection with the construction of the municipal plant, it certainly leaves to the city council little uncontrolled discretion with respect thereto. It is apparent that, while the government was willing to finance the city, it insisted upon retaining sufficient control over plans, construction contracts, labor, and materials, to insure that the money furnished would be spent in the way the government thought it should be spent, whether that was in accord with the ideas of the city council or not.

We are satisfied that the city of Kennett, under the laws of Missouri, had no power to enter into this loan agreement.

Our attention, however, is called to the following provision of the agreement: "If any provision of this Agreement shall be invalid in whole or in part, to the extent that it is not invalid it shall be valid and effective and no such invalidity shall affect, in whole or in part, the validity and effectiveness of any other provision of this Agreement or the rights or obligations of the parties hereto, provided, in the opinion of Counsel for the Government, the Agreement does not then violate the terms of the Act."

Whatever this provision may have been intended to accomplish, the agreement as written embodies the terms and conditions under which the government was willing to finance the city in building the municipal plant. We would have no right to assume that, without the substantial control over the project which is provided for in the agreement, the government would consent to carry it out. We certainly are not required to attempt to eliminate all of the objectionable features of the contract which the parties have made, and if we were, the government could refuse to perform it if, in the opinion of counsel for the government, the agreement then violated "the terms of the Act." The attempted delegation of authority by the city, in our opinion, vitiates the entire agreement. If the government is willing and able to enter into an agreement with the city without requiring from it any delegation of legislative authority, that can easily be ar-

ranged, or the government can buy the bonds and make the grant, and let the city build its own plant in its own way.

Our conclusion is that the defendants, other than the defendant Ickes, were not entitled to a dismissal of the bill, and that the plaintiff's application for a preliminary injunction against the city of Kennett and its officers should have been granted.

### No. 10296.

What we have hereinbefore said with reference to the case involving the city of Kennett would rule the case of the city of Trenton, except for the fact that in the latter case diversity of citizenship does not exist. Since it appears both from the pleadings and the proof that the plaintiff in that case is in no position to challenge the power of the government to make the loan and grant, the only question left relates to the power of the city of Trenton, under the laws of Missouri, to enter into the loan agreement. If the city could lawfully make the agreement under the laws of the state, it seems clear that the plaintiff can invoke no provision of the Constitution of the United States to prevent the exercise of that right. The question of the validity of the loan agreement, so far as the plaintiff is concerned, rests entirely upon the state law. We have, then, a suit, which does not arise under the Constitution and laws of the United States, but which is solely a controversy between two citizens of Missouri as to the laws of that state. Ickes, Administrator, was never more than a nominal defendant in this case. He was not served with process, did not appear as a party in the court below, and filed a brief in this court only as amicus curiae. The federal questions sought to be raised, we think, under the circumstances, were plainly unsubstantial and did not confer jurisdiction on the court below to dispose of the case upon its merits. Levering & Garrigues Co. et al. v. Morrin et al., 289 U. S. 103, 53 S. Ct. 549, 77 L. Ed. 1062. See, also, City of Fergus Falls v. Fergus Falls Water Co. (C. C. A. 8) 72 F. 873, 876; St. Paul, M. & M. Ry. Co. et al. v. St. Paul & N. P. R. Co. (C. C. A. 8) 68 F. 2, 11; Minnesota v. Northern Securities Company, 194 U. S. 48, 65, 66, 24 S. Ct. 598, 48 L. Ed. 870; Malone v. Gardner et al. (C. C. A. 4) 62 F.(2d) 15; Hull v. Burr, 234 U. S. 712, 720, 34 S. Ct. 892, 58 L. Ed. 1557; Defiance Water Co. v. Defiance, 191 U. S. 184, 190, 191, 24 S. Ct. 63, 48 L. Ed. 140; Shreveport v. Cole, 129 U. S. 36, 41, 9 S. Ct. 210, 32 L. Ed. 589; New Orleans v. Benjamin, 153 U. S. 411, 424, 14 S. Ct. 905, 38 L. Ed. 764; Western Union Telegraph Company v. Ann Arbor Railroad Company, 178 U. S. 239, 243, 244, 20 S. Ct. 867, 44 L. Ed. 1052; Starin v. New York, 115 U. S. 248, 257, 258, 6 S. Ct. 28, 29 L. Ed. 388; Venner v. New York Central R. Co. (C. C. A. 6) 293 F. 373.

In No. 10295, the decree is reversed, except as to the defendant Ickes, and the case remanded, with instructions to grant the application of the plaintiff for a preliminary injunction and for such further proceedings as are not inconsistent with this opinion.

In No. 10296, the case is remanded, with directions to change the decree to one of dismissal for lack of jurisdiction.

Costs in No. 10295 will be taxed against appellees, except Ickes. In No. 10296, costs will be divided equally.