# MISSOURI PUBLIC SERVICE CORPORATION v. FAIRBANKS, ·MORSE & ·CO. et al.

## No. 2877.

District Court, W. D. Missouri, W. D. Jan. 16, 1937.

See, also, 19 F.Supp. 45.

A. Z. Patterson and D. C. Chastain (of Sparrow, Patterson, Chastain & Graves), and Cyrus Crane (of Lathrop, Crane, Reynolds, Sawyer & Mersereau), all of Kansas City, Mo., for plaintiff.

Robert B. Fizzell (of Bowersock, Fizzell & Rhodes), of Kansas City, Mo., and Russell Pickett, of Trenton, Mo., for defendant.

OTIS, District Judge.

The city of Trenton, Mo., now is engaged and for some time has been engaged in constructing a plant with necessary accessories for the manufacture and distribution of electricity to its inhabitants and for public municipal purposes. The city is a defendant in this proceeding brought against it and others by the plaintiff, a private corporation, which is engaged in manufacturing and selling electricity in Trenton and elsewhere for profit. Interested in preventing, if possible, the competition which will result from the construction and operation of a municipal lighting plant, plaintiff seeks by its bill to have a permanent injunction preventing the completion of the construction now in progress and preventing thereby the operation of a competing plant. Whether pending final hearing, a temporary injunction shall issue is the subject of this memorandum.

It is no part of the theory of plaintiff's bill that such a public corporation as the city of Trenton may not under any circumstances construct and operate a municipal lighting plant. The theory of the bill is that in this instance the construction of the proposed plant is unlawful in that Missouri statutes governing the procedure to be followed if such a plant is constructed were not complied with. Whether that theory is supported by the facts (as the facts are shown by the evidence received at the hearing) is the question first to be considered.

The material facts in the light of which the primary question must be answered are (and we find them to be) as follows:

### Findings of Fact.

1. On October 18, 1933, there was duly and regularly enacted and approved Ordinance No. 1352 of the city of Trenton, calling an election for the purpose of submitting to the voters a proposition to increase the indebtedness of the city in the sum of $250,000 and to issue negotiable general obligation bonds of the city in that amount to provide funds for the purpose of paying the cost of purchasing and constructing an electric light plant in said city, to be exclusively owned by the city. The election was called to be held November 14, 1933.

2. On November 14, 1933, the election called by Ordinance No. 1352 was duly held. At that election more than two-thirds of the voters voting at said election voted for the approval of the proposed municipal indebtedness.

3. On January 11, 1936, Ordinance No. 1400 of the city of Trenton was enacted and approved. This ordinance purported to fix, regulate, and establish working conditions, hours of labor, wages to be paid labor, and other conditions, in the construction of the proposed municipal electric lighting plant. Ordinance No. 1400 was introduced in evidence and is herein incorporated by reference.

4. On January 11, 1936, Ordinance No. 1401 of the city of Trenton was enacted and approved. This ordinance purported to approve, adopt, and ratify certain detailed plans and specifications for the construction of the proposed municipal elec-

40

tric lighting plant and to approve and ratify certain forms of notice to contractors, construction regulations, and forms of contracts. In the forms of notice to contractors, a minimum hourly wage scale is set up similar to that embodied in Ordinance No. 1400. Ordinance No. 1401 was introduced in evidence and is herein incorporated by reference.

5. The Public Works Administration (described usually as PWA) offered to enter into an agreement with the city of Trenton under which it would aid in financing the construction of the proposed municipal lighting plant by purchasing bonds to be issued and by making a grant, the purchase and grant, however, to be upon certain conditions, the most important of which conditions were that the city of Trenton in the construction of the proposed municipal electric plant would construct the same in accordance with city ordinances 1400 and 1401 and would require contractors and subcontractors to make certain reports to the Department of Labor of the United States. The offer of PWA to enter into this agreement never was accepted by the city of Trenton. No bonds issued by the city of Trenton ever were purchased by PWA. It is not alleged in the bill, nor has there been any showing that any grant has in fact been made to the city of Trenton nor that any part of any such grant, if one was made, has been paid.

6. On June 26, 1936, the city of Trenton sold its bonds No. 9 to 242 of the issue authorized at the election of November 14, 1933, to the defendant Baum, Bernheimer Company for a total cost of $251,770, which that company paid to the city of Trenton. Before the filing of the bill in this case, Baum, Bernheimer Company had sold all of the bonds so purchased to its customers.

7. On August 6, 1936, Ordinance No. 1417 of the city of Trenton was enacted and approved. This ordinance provided for a time and place for receiving bids on the proposed municipal electric lighting plant and for the publishing of notice that bids would be received and of the terms and conditions under which they would be received. Thereafter the notices required to be published by Ordinance No. 1417 were published. The notices so published did not contain a paragraph (as required by section 13320a of the Laws of Missouri, p. 264, approved May 5, 1931 [Mo. St.Ann. § 13320a, p. 5171]) reading as follows:

"By virtue of statutory authority, a preference will be given to materials, products, supplies, provisions and all other articles, produced, manufactured, made or grown within the state of Missouri."

The notices were not published in newspapers of the circulation specified in section 13745, R.S.Mo.1929 (Mo.St.Ann. § 13745, p. 6519). [1]

8. On the date fixed in the ordinance (September 2, 1936) bids were received and opened. On September 3, 1936, a contract was entered into with the defendant Fairbanks, Morse & Co. for furnishing and installing power plant equipment in the proposed municipal electric lighting plant for a total sum of $119,543. On the same day a contract was entered into with Mattison-Wallack & Co. for the construction of a distribution system for the proposed municipal electric lighting plant for a total sum of $96,935.24. At a later date a contract was entered into with Ebbe Construction Company for the construction and erection of a power plant building for the total sum of $44,466. Before the filing of the bill in this case, the equipment called for by the contract with the defendant Fairbanks, Morse & Co. had been delivered and $54,000 had been paid to that company under the contract. Before the filing of the bill in this case the contract with Mattison-Wallack & Co. had been completed and the full amount of the contract price had been paid to that company. Before the filing of the bill in this case, some work had been done under the contract with Ebbe Construction Company and the sum of $1,558.33 had been paid to that company.

1. The contention is made by plaintiff that the procedure followed by the city of Trenton departed in four respects from

_____

[1] It is very doubtful if the bill sufficiently or definitely alleges a failure to comply with section 13745 of the Revised Statutes of Missouri for 1929 (Mo.St. Ann. § 13745, p. 6519). Since, however, it was conceded at the argument that that section, if applicable to the city of Trenton, was not complied with, and since the bill may so easily be amended as to definitely allege a noncompliance with this statute, this opinion has been written upon the assumption that the bill contains the allegation.

the procedure prescribed by statute and, therefore, that it was unlawful. It is contended (1) that the laws of Missouri require notices for bids such as are given here to include a paragraph reading, "By virtue of statutory authority, a preference will be given to materials, products, supplies, provisions and other articles produced, manufactured, made or grown within the state of Missouri"; that the notices given in this instance did not contain that paragraph and that no preference was given to Missouri materials, products, supplies, provisions, and other articles; (2) that notices to bidders were not published in newspapers of the circulation specified in section 13745, R.S.Mo.1929 (Mo.St. Ann. § 13745, p. 6519); (3) that contracts in this instance were not awarded, at least in one instance, to the lowest bidder; (4) that Ordinances 1400 and 1401 were not within the authority of the city of Trenton to enact and were unlawful as imposing conditions making impossible the lowest and best bid which the city was authorized only to accept.

Of these three contentions, contention (1) is bottomed upon the provisions of section 13745, R.S.Mo.1929, and sections 13320 and 13320a, R.S.Mo.1929, as added May 5, 1931 (Mo.St.Ann. §§ 13320, 13320a, p. 5171). Contention (2) is bottomed upon the provisions of section 13745. The text of section 13745 is set out in the margin.[2] More fully stating contention (1) it is that by section 13745 the city of Trenton was required to request bids for the material to be furnished and work to be done in connection with the proposed municipal lighting plant by advertising therefor and that by section 13320a it was required to insert in such advertising the paragraph specified in that section and set out above.

There cannot be much doubt but that if the city of Trenton was required to advertise in newspapers or otherwise in writing for bids in connection with the construction of the proposed plant, then it was required to cause to be printed in that advertising the paragraph specified in section 13320a. The question then is whether it was required to advertise for bids. The only statute which it is claimed imposes such a requirement is section 13-745. The defendants contend, however, that that section does not apply to the city of Trenton, that it applies to no other political subdivision of the state than such as have 500,000 inhabitants or over, that is, that it applies only to the city of St. Louis. And it is true that the St. Louis Court of Appeals has held that section 13-745 is applicable to no other city than to the city of St. Louis. Dunham Construction Company v. City of Webster Groves (Mo.App.) 84 S.W.(2d) 183, 184. But we are not bound by the construction placed upon section 13745 by the St. Louis Court of Appeals and must interpret the statute for ourselves.

Interpreting the statute for ourselves, we find it impossible to agree either with learned counsel for defendants or the learned St. Louis Court of Appeals. It seems clear to us that the statute applies to such a city as Trenton. Consider the very language used in the statute:

"No contract shall be made by an officer of this state or any board * * * existing * * * under the charter * * * of any political subdivision thereof, having the expenditure of public funds or moneys * * * raised in whole or in part by

2 No contract shall be made by an officer of this state or any board or organization existing under the laws of this state or under the charter, laws or ordinances of any political subdivision thereof, having the expenditure of public funds or moneys provided by appropriation from this state in whole or in part, or raised in whole or in part by taxation under the laws of this state, or of any political subdivision thereof containing 500,000 inhabitants or over, for the erection or construction of any building, improvement, alteration or repair, the total cost of which shall exceed the sum of ten thousand dollars, until public bids therefor are requested or solicited by advertising for ten days in one paper in the county in which the work is located; and if the cost of the work contemplated shall exceed thirty-five thousand dollars, the same shall be advertised for ten days in the county paper of the county in which the work is located, and in addition thereto shall also be advertised for ten days in two daily papers of the state having not less than fifty thousand daily circulation; and in no case shall any contract be awarded when the amount appropriated for same is not sufficient to entirely complete the work ready for service. The number of such public bids shall not be restricted or curtailed, but shall be open to all persons· complying with the terms upon which such bids are requested or solicited.

taxation under the laws of this state, or of any political subdivision thereof containing 500,000 inhabitants or over, for the * * * construction of any * * * improvement, * * * the total cost of which shall exceed the sum of ten thousand dollars, until public bids therefor are requested or solicited by advertising," etc.

Certainly the city council of Trenton is a "board * * * existing * * * under the charter * * * of any political subdivision" of the state. Certainly it is a board "having the expenditure of public funds." Certainly the contracts which were entered into by this board were "for the * * * construction of [an] * * * improvement * * * the total cost of which" exceeded both $10,000 and $35,000. Upon what possible theory then is it contended that the section does not apply to the city council of Trenton?

It seems to us that the theory advanced by the St. Louis Court of Appeals is untenable. Said that court:

"There can be no doubt that the statute by express mention includes any municipality containing 500,000 inhabitants or over, and thus by implication excludes all the rest. Expressio unius est exclusio alterius."

But the rule of statutory construction thus relied on, it seems to us, has no application. The expression of one thing in a statute does not exclude another thing when the other thing also is expressed. In this statute we have the phrase "any political subdivision" (which certainly would include Trenton) preceding and quite as fully expressed as the phrase "any political subdivision * * * containing 500,000 inhabitants or over." To say that the second phrase, because it is expressed, excludes the first phrase, which also is expressed, is to misapply the rule of construction. Moreover, the language "or of any political subdivision thereof containing 500,000 inhabitants or over" very obviously is used conjunctively with the immediately preceding language, "by taxation under the laws of this state." It is not

used in the same connection as is the preceding phrase "of any political subdivision." The meaning of the section is as if it were written thus, "No contract shall be made by an officer of this state or any board * * * existing * * * under the charter * * * of any political subdivision thereof having the expenditure of (1) public funds or (2) moneys provided by appropriation from this state in whole or in part, or (3) moneys raised in whole or in part by taxation under (a) the laws of this state, or (b) of any political subdivision thereof containing 500,000 inhabitants or over."

Obviously, the expression "any political subdivision thereof containing 500,000 inhabitants or over," used in one connection cannot have any effect upon the meaning given to the phrase "any political subdivision" used in an entirely different connection.

In addition to the argument advanced by the St. Louis Court of Appeals, there is to be considered the argument independently advanced by counsel for the defendants in this case, that the title of section 13745, as it was originally enacted, was not sufficiently broad to cover the interpretation urged now by the plaintiff. The title is set out in the margin. [3] We think that that part of the title which reads, "no * * * board or organization existing under the laws of this state * * * shall contract for the * * * construction of any * * * improvement * * * until public bids are requested," sufficiently covers such an interpretation of the statute as plaintiff urges. Certainly the city council of Trenton is a board or organization existing under the laws of the state, as is the city council of any other municipality.

Having concluded that section 13745 does apply to contracts entered into by the city of Trenton, it follows that section 13320a also applies. The requirements of neither of these two sections was complied with. Bids were not requested or solicited "by advertising * * * for ten days in

---

[3] An Act to amend chapter 10 of the Revised Statutes of Missouri, 1899, relating to and entitled "Contracts and promises," by adding two (2) new sections thereto, to be known as sections 899a and 899b, providing that no officer of this state or any board or organization existing under the laws of this state or any political subdivision there-

of containing 500,000 inhabitants or over, shall contract for the erection or construction of any building, improvement, alteration or repair to cost more than ten thousand dollars ($10,000), until public bids are requested or solicited therefor and repealing all acts or parts of acts inconsistent herewith (Laws 1909, p. 346.)

the county paper of the county in which the work [was] located, and in addition thereto * * * for ten days in two daily papers of the state having not less than fifty thousand daily circulation" (requirement of section 13745) and in the notices which were published the paragraph required by section 13320a was not included. But what was the effect of the disregard of these statutes, particularly of section 13745, upon the contracts.

Here there were three separate contracts, one with Fairbanks, Morse & Co., for furnishing and installing power plant equipment, one with Mattison-Wallack & Co., for the construction of a distribution system, and one with Ebbe Construction Company, for the construction of a power plant building. The city of Trenton should not have entered into any one of these contracts without advertising for bids as required by section 13745, but without that advertising it did enter into each of them. It entered into them in the teeth of the statute which in so many words declares that "no [such] contract shall be made." We cannot agree with the suggestion that a positive prohibition of this character is merely directory. What was said by the Eighth Circuit Court of Appeals in Layne-Western Company v. Buchanan County, 85 F.(2d) 343, may be read with profit in this connection. We consider that each of these contracts was entered into unlawfully for failure to comply with section 13745. It is unnecessary to consider whether also they were entered into unlawfully on other grounds. The next question is, Is this plaintiff entitled to equitable relief against carrying out the contracts?

2. Plaintiff claims it is entitled to equitable relief against the carrying out of the contracts, because, (1) it holds a franchise to operate a municipal lighting plant in Trenton and is entitled to protection against illegal competition by others, (2) because it is a taxpayer of the city of Trenton.

If it be assumed that the plaintiff does have a franchise to operate an electric lighting plant in Trenton, then it must be ruled by this court that it has a sufficient interest to entitle it to the equitable relief prayed in its bill. We are bound by the decision of the Circuit Court of Appeals for the Eighth Circuit in City of Campbell v. Arkansas-Missouri Power Company, 55 F.(2d) 560, 562. See, also, Arkansas-Missouri Power Co. v. City of Kennett (C.C.A.) 78 F.(2d) 911, and Iowa Southern Utilities Co. v. Cassill (C.C.A.) 69 F.(2d) 703. It was ruled in that case that a company in plaintiff's situation is entitled to an injunction against the carrying out of a contract for the purchase of machinery for a municipal lighting plant which will operate in competition with a private plant if the contract was unlawfully entered into. That decision is directly in point on the immediate question. [4] Plaintiff is entitled to maintain this suit.

[4] We are bound to follow the decision of the Circuit Court of Appeals and cheerfully do follow it, although, with the greatest possible respect for that most learned court, we do not think that all that was said by that court in the case cited necessarily follows from the principle of law upon which the decision of the court is bottomed. The court said that the plaintiff in that case "as the holder of this franchise [a non-exclusive franchise] to maintain and operate the plant in defendant city, was entitled to protection against all illegal competition." It is gravely to be questioned, however, whether, if a city has the right to construct and operate a municipal lighting plant, as with the proceeds of lawfully issued bonds, or out of a surplus in its treasury, or from money given to it by a philanthropist or a philanthropic government, a private company is entitled to an injunction preventing, not the operation of a completed municipal plant to which the city has unquestioned title, but the carrying out of some unlawfully entered into contract for the construction of some part or all of the plant. The right of the private company to an injunction arises from the illegality of the competition which results from the operation of a municipal plant. It is only the operation of the municipal plant in competition with the private plant that can injure the private plant. It does not seem to us that it can be said that the operation of a municipal plant is illegal because some contract incidental to the construction of the plant unlawfully was entered into.

Suppose we assume that in the instant case the contract for the construction of the distribution system was in all respects as required by law and that the distribution system has been constructed and has been paid for. Let us assume also that the contract for the construction of the plant building was in all respects as required by law

3. So far these conclusions have been reached: (1) The contracts involved in the construction of the proposed municipal lighting plant in Trenton were entered into unlawfully in that the procedure prescribed in section 13745 was not followed. (2) The plaintiff, as a company having a franchise to operate an electric lighting plant in Trenton, is entitled to relief in equity against the carrying out of the contracts referred to.

It is contended, however, by learned counsel for defendants that plaintiff does not in fact have a franchise from the city of Trenton and that, in any event, plaintiff has been guilty of such laches as not to be entitled to the relief it prays. These are serious questions. We cannot now anticipate how these questions finally will be resolved. But, from a consideration of the allegations of the bill alone, we cannot say that plaintiff does not have a franchise (or its equivalent) from the defendant city. We cannot say from the allegations of the bill alone that the plaintiff has been guilty of such laches as should preclude injunctive relief in its behalf. These questions must be determined only upon a full and final hearing of all the evidence that bears upon them. Being otherwise entitled upon the facts alleged and found and under the law to injunctive relief against defendants, plaintiff is entitled to a preservation of the status quo ante until a final hearing. If nothing is done by the parties to delay that final hearing, all the questions involved in this controversy speedily will be determined.

A temporary injunction will issue forbidding, until the entry of a final decree in this case, the further carrying out by any of the defendants of any of the contracts involved in the construction of the proposed municipal lighting plant.

---

and that the plant building has been constructed and has been paid for. Only the contract for the purchase of necessary engines and dynamos was unlawfully entered into (there was not that character of advertising for bids which the law requires). How can the carrying out of that contract directly injure the private company? If the contract is carried out, if the engines and dynamos are delivered and paid for, the private company has not yet been injured. If the engines and dynamos have been delivered and paid for (so that at least the vendor cannot complain of the city's title), where is the law which makes the operation of the engines and dynamos by the city an unlawful operation? With all respect for the learned Circuit Court of Appeals, to our minds it seems a far fetched conclusion to say that the operation of a municipal lighting plant is unlawful because perchance in the purchase of the ground on which the plant is builded or in the contract for the construction of the building or in the contract for the purchase of engines and dynamos there was a departure from the procedure prescribed by law.

It does not seem to us that there is any difference between illegal competition by a municipal lighting plant with a private plant and illegal competition with a private plant by another private plant. Suppose then we assume that the City of Trenton has granted a franchise to X Company, authorizing it to construct and operate an electric lighting plant in Trenton, in competition with plaintiff's plant in that city. Since the plaintiff does not claim that it has an exclusive franchise it certainly could not have an injunction against the operation of this competing plant, assuming that the franchise of the latter was regularly granted to it. Is it possible that the plaintiff could obtain an injunction against the carrying out of a contract by X Company for the purchase of engines and dynamos on the theory that the contract was not within the charter powers of X Company. Certainly the plaintiff could have no such equitable relief and that for the very simple reason that the purchase of engines and dynamos by X Company does not harm the plaintiff. Certainly also the operation of engines and dynamos by X Company cannot be illegal, because its purchase of such engines and dynamos was ultra vires. We conceive that the operation of its lighting plant by X Company would not be an illegal operation even if it had obtained its engines and dynamos by robbery.