### DUKE POWER CO. et al. v. GREENWOOD COUNTY et al.

No. 4209.

Circuit Court of Appeals, Fourth Circuit.

Aug. 6, 1937.

W. S. O'B. Robinson, Jr., of Charlotte, N. C., and Raymond T. Jackson, of Cleveland, Ohio (Newton D. Baker, of Cleveland, Ohio, W. R. Perkins, of New York

City, H. J. Haynsworth, of Greenville, S. C., and J. H. Marion and W. B. McGuire, Jr., both of Charlotte, N. C., on the brief), for appellants and cross-appellees.

W. H. Nicholson, of Greenwood, S. C., and D. W. Robinson, Jr., of Columbia, S. C. (R. F. Davis, of Greenwood, S. C., and Jas. F. Dreher, of Lexington, S. C., on the brief), for appellees and cross-appellants Greenwood County and its Finance Board.

Jerome N. Frank, Legal Counsel, Federal Emergency Administration of Public Works, of New York City, and Enoch E. Ellison, Atty., Department of Justice, of Washington, D. C. (James W. Morris, Asst. Atty. Gen., Paul Freund, Sp. Asst. to Atty. Gen., E. H. Foley, Jr., Gen. Counsel, Robert E. Sher, Asst. Legal Counsel, and William J. Dempsey, Sp. Counsel, Federal Emergency Administration of Public Works, all of Washington, D. C., on the brief), for appellee and cross-appellant Harold L. Ickes, Federal Emergency Administrator of Public Works.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is the third time that we have had before us the suit of the Duke Power Company and its subsidiary, the Southern Public Utilities Company, to enjoin the construction by Greenwood County, S. C., of a power dam at Buzzard Roost Falls on the Saluda River and to enjoin Harold L. Ickes, the Federal Administrator of Public Works, from making a loan and grant of $2,852,000 to the county under the provisions of title 2 of the National Industrial Recovery Act, 48 Stat. 200, § 201 et seq., 40 U.S.C.A. § 401 et seq., for the construction of the project. Upon the first appeal we remanded the cause in order that the court below might reconsider its decision in the light of a new contract which had been entered into between the county and the Administrator of Public Works. Greenwood County v. Duke Power Co. (C.C.A.4th) 79 F.(2d) 995.

On the second appeal, we reversed the decree of the District Court granting an injunction, and directed that the bill of complaint be dismissed for want of equity, holding: (1) That the courts were bound by the finding of the Administrator that the project could be constructed within the limits of the loan and grant and would be a self liquidating project within the meaning of the act of Congress and the policy of the Public Works Administration; (2) that we were bound by the decision of the South Carolina Supreme Court in Park v. Greenwood County, 174 S.C. 35, 176 S.E. 870, to the effect that the construction of the power plant and the issuance of revenue bonds to pay for same were within the powers of the county; (3) that the statute under which the Administrator proposed to make the loan was constitutional; (4) that the Administrator was acting within his powers in making same; and (5) that no legal right of plaintiffs was infringed by the making of the loan or the construction of the project, and that plaintiffs for this reason were not entitled to an injunction in any event. Greenwood County v. Duke Power Co. (C.C.A.4th) 81 F.(2d) 986. The Supreme Court granted certiorari and held that we had erred in our order remanding the case on the first appeal, in that we had not vacated the decree appealed from, and that this error on our part had misled the District Judge so that he unduly limited the hearing upon the remand. It declined, therefore, to pass upon any of the questions upon which we had ruled on the second appeal, but remanded the cause to the District Court with direction that the decree entered by that court be vacated, that the parties be permitted to amend their pleadings in the light of the existing facts, and that the cause be retried upon the issues thus presented. Duke Power Co. v. Greenwood County, 299 U.S. 259, 57 S.Ct. 202, 81 L.Ed. 178.

Upon receipt of mandate from the Supreme Court the District Court entered an order setting aside the decrees which it had theretofore rendered, permitted amended pleadings to be filed, and set the case down for hearing de novo over the protest of counsel for plaintiffs, who contended that the hearing should be limited to matters which had occurred subsequent to the first appeal. As we interpret the opinion of the Supreme Court, however, the course adopted by the District Judge was entirely correct. The case was one in which it appeared, to use the language of the Supreme Court, that supervening facts required "a retrial in the light of a changed situation"; and, in passing upon the effect of the new contract and the relief appropriate in the light of the changed situation, there was no reason why the District Judge should have considered himself limited in any way by the evidence introduced or findings made upon prior hearings. The setting aside of the decrees in the District Court left the cause in precisely the position that it would have occupied if no final decree had ever been entered; and we think there can be no doubt as to the power of the court in an equity cause, until final decree has been

entered, to hear additional evidence and modify or set aside any finding of fact theretofore made. Fourniquet v. Perkins, 16 How. 82, 14 L.Ed. 854; Glades County v. Detroit Fidelity & Surety Co. (C.C.A. 5th) 65 F.(2d) 252; Wagner v. Meccano (C.C.A.6th) 235 F. 890; Dangerfield v. Caldwell (C.C.A.4th) 151 F. 554. The opinion of the Supreme Court determines none of the issues raised in the cause, but directs that, after the pleadings shall have been amended, it "be retried upon the issues then presented"; and it is well settled that the granting of a new trial by an appellate court reopens every issue in the case, except as to questions definitely and finally determined upon the appeal. American Surety Co. v. Jackson (C.C.A.9th) 26 F.(2d) 248; Shell Petroleum Corp. v. Shore (C.C.A.10th) 80 F.(2d) 785; Glades County v. Detroit Fidelity & Surety Co., supra; Cyclopedia of Federal Procedure, vol. 6, p. 820.

Upon the retrial had in the court below, the evidence theretofore taken in the cause was introduced, including the new contract and the other evidence received following the first remand, as well as the evidence taken prior to the first appeal. Additional evidence was also introduced bearing upon the loss which plaintiffs would sustain from competition resulting from the construction of the project and upon the consideration given by the Administrator and his subordinates to the effect on power rates of other projects for which application for loans and grants had been made. The judge below filed an exhaustive opinion upon all of the questions presented and set forth his findings of fact and conclusions of law fully and completely as required by the equity rules. He held the statute under which the loan and grant were made to be constitutional and the action of the Administrator in making same to be a valid exercise of his authority under the statute. He dismissed the bill, therefore, taxing one-half of the costs, however, against the defendants on the ground that they had prolonged the litigation by opposing the application of plaintiffs to intervene in the case of Park v. Greenwood County, 174 S.C. 35, 176 S.E. 870, when that cause was pending before the Supreme Court of South Carolina. From the decree dismissing the bill, the plaintiffs have appealed, and the defendants have appealed from so much of it as taxes them with costs. The appeals present four questions for our consideration: (1) Whether the statute under which the Administrator has made the loan and grant is a valid exercise of congressional power; (2) whether the making of the loan and grant by the Administrator is within the power granted him by the statute; (3) whether, in any event, any right of plaintiffs is violated by the making of the loan and grant; and (4) whether any costs should have been taxed against defendants.

## Statement of Facts

The facts are as follows: The plaintiff power company, which operates in the Piedmont section of the Carolinas, and to which we shall hereafter refer as the plaintiff, is the only large power company doing business in Greenwood County, South Carolina, and surrounding counties. The record shows, however, that it furnishes not exceeding 15 per cent. of the power now used in Greenwood County, the remainder being supplied by steam plants of manufacturing companies. After the passage of the National Industrial Recovery Act in 1933, officials of that county, without solicitation or suggestion from the Public Works Administration, conceived the plan of obtaining authority from the State of South Carolina for the construction by the county of a dam and power plant at Buzzard Roost Falls on the Saluda River and of obtaining a grant and loan from the Public Works Administration for financing the project. Authority from the state was duly obtained (Acts May 8, 1933, March 26, 1934, 38 St. at Large, S.C. pp. 411, 1392), and application for loan and grant in the total sum of $2,800,000 was made by Greenwood County to the Administrator of Public Works in November 1933. Without consulting with the Public Works Administrator, the county prepared and included in its application a schedule of rates to be charged for the sale of electric energy to the various classes of its proposed customers. Notwithstanding the change in the contracts between the county and the Administrator, to which we shall refer hereafter, these rates have never been changed.

After full consideration of the application by the Administrator of Public Works, an allotment was made for this project on June 19, 1934, and was approved by the President of the United States on the following day. Plaintiff having asked to be heard in opposition to the allotment was accorded a hearing on July 2, 1934, and the matter was held in abeyance until November 7th, when the allotment was reaffirmed by the Administrator and the President. A contract was thereupon entered into between the Administrator and the

county on December 8, 1934, under which the Administrator agreed to make a grant to the county for the development of the project of 30 per cent. of the cost of labor and materials, not to exceed the sum of $682,000 and to buy such portion of the $2,219,000 of 4 per cent. revenue bonds to be issued by the county for its construction as should not be sold to outside parties. One of the provisions of the contract was that the government should be under no obligation to take the bonds or make any portion of the grant if the county should not have adopted a schedule of rates satisfactory to the Administrator. After the decision of the Circuit Court of Appeals of the Eighth Circuit in Arkansas-Missouri Power Co. v. City of Kennett, 78 F.(2d) 911, holding that the execution of a contract with such a provision was beyond the power of a municipal corporation of Missouri, and after the decision of Judge Watkins below, holding that such a provision gave the Administrator control over the rates to be charged, this provision was eliminated from all contracts thereafter executed by the Administrator; and on November 30, 1935 the county and the Administrator entered into a new contract superseding that of December 8, 1934. The new contract gave the Administrator no power whatever with respect to rates to be charged by the county, and contained the following provisions:

"12. The Administrator and the Government shall have no right or power of any kind with respect to the rates to be fixed or charged for the services and facilities afforded by the project, excepting only such rights as they may have as a holder of such bonds under the laws and Constitution of South Carolina, and the lawful proceedings of the applicant, taken pursuant thereto, in authorizing the issuance of such bonds.

"13. This agreement is made with the express understanding that neither the loan nor the grant herein described is conditioned upon compliance by the applicant with any conditions not expressly set forth herein. There are no other agreements or understandings between the applicant and the government or any of its agencies in any way relating to said project."

It is the contention of plaintiff that the loan and grant were made to the county by the Administrator for the purpose of affecting the rates charged by plaintiff for electric power, and at all events, that the inevitable effect of the construction of the project will be to lower rates in the territory in which plaintiff operates; and much testimony was adduced as to the policy of the Public Works Administration in approving loans and grants for power projects. As to this it appears that the Electric Power Board of Review which was set up in 1933, but which was abolished by order of the Administrator on March 16, 1935, did have a policy with respect to approving loans to municipal power projects to the effect that such projects should meet standards of social desirability, as well as engineering soundness and reasonable security. Social desirability, under this policy, depended among other things upon whether or not the municipal project would provide current at rates substantially less than those at which it was provided by an existing utility; and, in cases where such utility would lower its rates to meet those proposed by the municipality, the policy was not to approve the municipal project. After the Electric Power Board of Review was abolished, the Power Division of the Public Works Administration was placed in charge of the approval of applications for loans and grants for power projects; and its policy has been that, for a municipal power project which is to be financed by revenue bonds to secure approval, its proposed rates must be sufficiently low to secure business and sufficiently high to take care of the interest and amortization payments on the bonds (R. 671). Social desirability is assumed when the application comes from a city (R. 672). The Administrator testified that there has in reality been no change in the policy of the Public Works Administration with respect to power loans (R. 656); that they were considered on the same basis as other loans, the primary consideration being "social desirability, ability of the community to finance its share of it and its relationship to the question of unemployment" (R. 647); and that, in the case of a project to be financed by revenue bonds, the only interest which the Administrator had in the rates was whether or not the rates to be charged would repay the loan within the time limited in the contract (R. 647).

The fact seems to be that the policy of the Public Works Administrator has been to take into consideration the rates of competing utilities in considering applications for loans and grants for the construction of municipal power plants, and that one of the chief reasons for this is that the construction of a municipal plant would not ordinarily be a financially sound proposition unless it should be able to obtain business in competition with existing utilities; that, in the beginning, much emphasis was placed upon the social desirability of lowering pow-

er rates to the public; but that, after the policy of the Public Works Administration had been attacked on the ground that, by attempting to bring about lower power rates, it was interfering with a matter reserved to state control, this emphasis on "social desirability" of lower rates has been largely abandoned and the consideration of competitive rates has been had with reference to the financial security of the loan rather than the "social desirability" of the enterprise, the lowering of rates being regarded as an incidental result of the policy of making such loans and grants and not as one of the chief purposes thereof. In this connection, and as bearing upon the reasonableness of the contention that the Administrator has been abusing the power committed to him for the purpose of affecting local power rates, it appears that as of January 1, 1937, there were 9,389 "nonfederal" projects of the Public Works Administration, of which only 282 were power projects. Of these only 92 involved competition with existing private companies; and the total amount of money involved in these 92 projects was only $27,339,947, as compared with $1,480,612,543 involved in the 9389 nonfederal projects, or less than 2 per cent.

As to the policy applied in making the grant and loan here under consideration, the evidence is that the Public Works Administration had nothing to do with fixing the rates to be charged by the county; that there was no intention, in making the loan and grant, to affect the rates of plaintiff; and that those rates were taken into consideration only in connection with the financial security of the loan. As to this the judge below found:

"XVIII. I find that the defendant, Harold I. Ickes, Federal Emergency Administrator of Public Works, in making this allotment of funds to Greenwood County and in entering into the contract with the county, had no purpose other than that set out in the Act of Congress and that the policy of the Public Works Administration is correctly set out in the Administrator's report to the United States Senate (73rd Congress, 2nd session, Senate Document 167; Defendant's Exhibit 70):

" 'The fundamental purpose of the Public Works Administration is to relieve unemployment and to increase purchasing power through the construction of useful public works, thereby increasing the consumption of goods and also providing employment in the capital goods industry.'

"XIX. In view of the fact that the proposed loan to Greenwood County was to be evidenced by revenue bonds, it was necessary for the Public Works Administration, in order to carry out Congress' mandate that the loan should be reasonably secured (48 Stat., 203), to examine into the rates of the plaintiff who operated in the territory in which the Greenwood project would be developed. It was necessary that the Administrator be satisfied that the County's proposed rates were low enough to obtain customers and high enough to yield a revenue sufficient to 'liquidate the bonds."

As to the contention that the construction of the project would necessarily affect rates, the judge below found, and his finding is amply supported by the testimony, that the county project would not serve as a yardstick for the fixing of private utility rates because of the difference in construction costs, difference in overhead, freedom from taxation, etc. He further found that any effect which the construction of the county project will have on plaintiff's rates will be the result of the voluntary construction of an electric project by the county and the voluntary decision of the county to use that project in competition with plaintiff. As to the extent of this competition, he found that at the most the county plant will produce only about 25,-000,000 K. W. H. of electricity; that the county has plans to sell only 12,000,000 K. W. H. of this to those who are now customers of plaintiff; that in 1936 plaintiff sold 2,476,000,000 K. W. H. in the Piedmont Section of the Carolinas; and that this was an increase of 380,000,000 K. W. H. over its 1935 sales. In other words, the business which the county project will take from plaintiff is less than one half of one per cent. of the business which it did in 1936 and less than 4 per cent. of the amount by which that business was increased over the business of 1935. There is evidence that the gross income of the business which will be taken from plaintiff by the county contracts amounts to about $250,000 per year; and there is evidence that the demand for electric current is constantly growing and that new construction is constantly being required of plaintiff to take care of the growing demand.

## The Constitutionality of the Statute.

The question of the constitutionality of the statute (section 201 et seq. of title 2 of the National Industrial Recovery Act,

40 U.S.C.A. § 401 et seq.) was so thoroughly considered by us on the former appeal that we feel that we need do little more than refer to our former opinion for an expression of our views. See 81 F.(2d) 986, at pages 991 to 995. Confusion in thinking results from the method employed by plaintiff of arguing that the statute is unconstitutional "as applied by the Public Works Administrator" in making the loan and grant here under consideration. This involves, of course, two questions: (1) The validity of the act of Congress when tested by the Constitution; and (2) the authority of the Administrator when tested by the act of Congress. A statute may not be held void because of the action of an executive officer in applying its provisions. Even when there is an abuse of executive power against which the courts cannot relieve because of their inability to control administrative discretion, the act of Congress under which the action is taken is not rendered invalid any more than it is by action which is absolutely unauthorized. The constitutional validity of the statute must be considered, therefore, without reference to what the Administrator is doing under it; and, for the reason set forth in our former opinion, we think it is a valid exercise by Congress of the power to tax and spend for the general welfare, that it cannot be condemned as an invasion of the powers reserved to the states under the Tenth Amendment and that it does not embody an unconstitutional delegation of legislative power to the executive.

Our conclusion that it is within the power of Congress to tax and spend for the relief of unemployment nation wide in scope, and that the construction of a nation wide program of public works is an appropriate exercise of the power, is fortified by the recent decisions of the Supreme Court upholding the Social Security Act (42 U.S.C.A. § 301 et seq.), particularly the case of Chas. C. Steward Mach. Co. v. Davis, 57 S.Ct. 883, 890, 81 L.Ed. ——, 109 A.L.R. 1293, wherein the Court, speaking through Mr. Justice Cardozo, said:

"During the years 1929 to 1936, when the country was passing through a cyclical depression, the number of the unemployed mounted to unprecedented heights. Often the average was more than 10 million; at times a peak was attained of 16 million or more. Disaster to the breadwinner meant disaster to dependents. Accordingly the roll of the unemployed, itself formidable enough, was only a partial roll of the destitute or needy. The fact developed quickly that the states were unable to give the requisite relief. The problem had become national in area and dimensions. There was need of help from the nation if the people were not to starve. It is too late today for the argument to be heard with tolerance that in a crisis so extreme the use of the moneys of the nation to relieve the unemployed and their dependents is a use for any purpose narrower than the promotion of the general welfare. Cf. United States v. Butler, 297 U.S. 1, 65, 66, 56 S.Ct. 312, 319, 80 L.Ed. 477, 102 A.L.R. 914; Helvering v. Davis, 301 U.S. ——, 57 S.Ct. 904, 81 L.Ed. —— [109 A.L.R. 1319], decided herewith. The nation responded to the call of the distressed. Between January 1, 1933, and July 1, 1936, the states (according to statistics submitted by the government) incurred obligations of $689,291,802 for emergency relief; local subdivisions an additional $775,675,366. In the same period the obligations for emergency relief incurred by the national government were $2,929,307,125, or twice the obligations of states and local agencies combined. According to the President's budget message for the fiscal year 1938, the national government expended for public works and unemployment relief for the three fiscal years 1934, 1935, and 1936, the stupendous total of $8,681,000,000."

In Helvering v. Davis, 301 U.S. ——, 57 S.Ct. 904, 908, 81 L.Ed. ——, 109 A.L.R. 1319, another case involving the Social Security Act, the court, again speaking through Mr. Justice Cardozo, said:

"Congress may spend money in aid of the 'general welfare.' Constitution, art. 1, § 8; United States v. Butler, 297 U.S. 1, 65, 56 S.Ct. 312, 319, 80 L.Ed. 477, 102 A.L.R. 914. Steward Machine Co. v. Davis, supra. There have been great statesmen in our history who have stood for other views. We will not resurrect the contest. It is now settled by decision. United States v. Butler, supra. The conception of the spending power advocated by Hamilton and strongly reinforced by Story has prevailed over that of Madison, which has not been lacking in adherents. Yet difficulties are left when the power is conceded. The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground or certainly a penumbra in which discretion is at large. *The dis-*

cretion, however, is not confided to the courts. *The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment.* This is now familiar law. 'When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress.' United States v. Butler, supra, 297 U.S. 1, at page 67, 56 S.Ct. 312, 320, 80 L.Ed. 477, 102 A.L.R. 914. Cf. Cincinnati Soap Co. v. United States, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. ——, May 3, 1937; United States v. Realty Co., 163 U.S. 427, 440, 16 S.Ct. 1120, 41 L.Ed. 215; Head Money Cases, 112 U.S. 580, 595, 5 S.Ct. 247, 28 L.Ed. 798. Nor is the concept of the general welfare static. Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation. What is critical or urgent changes with the times.

"The purge of nation-wide calamity that began in 1929 has taught us many lessons. Not the least is the solidarity of interests that may once have seemed to be divided. Unemployment spreads from state to state, the hinterland now settled that in pioneer days gave an avenue of escape. Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 442, 54 S.Ct. 231, 241, 78 L. Ed. 413, 88 A.L.R. 1481. *Spreading from state to state, unemployment is an ill not particular but general, which may be checked, if Congress so determines, by the resources of the nation.* If this can have been doubtful until now, our ruling today in the case of the Steward Machine Co., supra, has set the doubt at rest." (Italics ours.)

Likewise, our conclusion that the statute cannot be condemned as an invasion of the reserved powers of the states is fortified by the decision in Steward Mach. Co. v. Davis, supra, wherein the court said that before a statute could be condemned on this ground there must be a showing that the things which it authorizes are "weapons of coercion, destroying or impairing the autonomy of the states." 57 S.Ct. 883, 890, 81 L.Ed. ——, 109 A.L.R. 1293. The carrying out of the program of public works authorized by the statute for the relief of unemployment cannot possibly have this effect; and, specifically, the making of loans and grants to municipal corporations to enable them to engage in enterprises which the states have authorized them to engage in cannot, in any use of language, be said

to abridge or invade the powers of the states. As we said in our former opinion: "It is an entirely different thing from giving or lending money to private persons for the purpose of defeating a state policy or regulating matters under state control." Any effect which such loans and grants may have upon rates will be incidental to the competition engendered by the construction of the projects; and where the state itself authorizes the projects and the procuring of the loans and grants for their construction, as did South Carolina in this case (Park v. Greenwood County, supra), and retains the right of regulating the rates through the exercise of state power, it cannot be contended with any show of reason that the power of the state is encroached upon by the making of the loans and grants or by the competition resulting from the construction of the projects which they make possible.

As to the delegation of legislative power to the executive, we pointed out in our former opinion that it was out of the question for Congress to have prescribed the details of an extensive program of public works for the relief of the national emergency; that Congress had appropriated money for the purpose, had laid down in the statute the principles which were to guide the President and the Administrator in its expenditure and had left to them the working out of the details; and that the selection of projects and the making of loans and grants in carrying out the policy thus laid down by Congress was the exercise of administrative, not legislative, discretion. At least as to the classes of projects enumerated in section 202, 40 U.S.C.A. § 402 [and the project here falls within classes (a), (b) and (c)], Congress "lays down a legislative standard and declares a legislative policy with requisite definiteness, and impliedly directs the President to effectuate the purposes of the Act and to make loans and grants, within the limits of a reasonable administrative discretion, to projects that fall within the classes enumerated in section 202 and the limitations of sections 203 and 206 [40 U.S.C.A. §§ 402, 403, 406]." Kansas Gas & Electric Co. v. City of Independence (C.C.A.10th) 79 F. (2d) 32, 43, 100 A.L.R. 1479.

In addition to this, it is clear that Congress has ratified and approved the program of public works formulated by the executive department under the act, by making additional appropriations for the carrying out of the program which had been laid before it. In response to

Senate Resolution No. 190, 73d Congress, approved February 15, 1934, the Administrator, on March 26, 1934, submitted a report to the Senate (Senate Document 167, 73d Congress, Def.Ex.No. 70) for the period ending February 15, 1934. The report contains a list of federal and nonfederal projects and includes the project here involved in a list of those on which final action had not been taken at that time (page 173). Three months later, Congress passed the Emergency Appropriation Act, approved June 19, 1934, c. 648, 48 Stat. 1021, 1055, making available additional funds for carrying out the program. The following year Congress enacted the Emergency Relief Appropriation Act of 1935, 49 Stat. 115 (15 U.S.C.A. § 728 note), which continued the existence of the Public Works Administration and authorized the continuance of its functions. An amendment offered in the Senate which would have required the selection of projects that would not compete with private enterprise was rejected. 79 Cong.Record 3972, 3973. On March 6, 1936 the Administrator, at the request of the Senate, reported to it a list of power projects which had been delayed as a result of litigation and included in the list the project here involved. 74th Cong., 2d Sess.Sen.Doc. 184. Thereafter the First Deciency Appropriation Act; fiscal year 1936, was adopted. Act June 22, 1936, 49 Stat. 1597, 1608. That act provided that a time limitation of July 1, 1938, which it prescribed should not apply to "any project enjoined in any Federal or State court," and appropriated $300,000,000 to increase employment by providing for useful public works projects "of the kind and character for which the Federal Emergency Administrator of Public Works * * * has heretofore made loans or grants pursuant to Title II of the National Industrial Recovery Act or the Emergency Relief Appropriation Act of 1935." 49 Stat. 1609 (15 U.S.C.A. § 728 note). Finally Congress passed the Public Works Administration Extension Act of June 29, 1937, containing the provisions of law relating to the availability of funds for carrying out the function of the Public Works Administrator to July 1, 1939. Section 201, chapter 401, title 2, Pub.Res. No. 47, 75th Congress. 15 U.S.C.A. § 728 note. "It is well settled that Congress may, by enactment not otherwise inappropriate, 'ratify * * * acts which it might have authorized.'" Swayne & Hoyt v. United States, 300 U.S. 297, 57 S.Ct. 478, 480, 81 L.Ed. 659; Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562. If, therefore, it could be held that the National Industrial Recovery Act did not lay down sufficiently precise standards for the exercise of the discretion reposed in the executive, it is clear that this defect has been cured by the subsequent legislation recognizing and approving the action taken by the Administrator and appropriating funds for the carrying out of the program of public works which he has prepared.

■ We think, however, that there is no need to rely upon this ratification by Congress of this program of the Administrator. The original statute was valid and not to be condemned as an unconstitutional delegation of legislative power. As said by the Supreme Court in the recent case of Cincinnati Soap Co. v. United States, 301 U.S. 308, 57 S.Ct. 764, 770, 81 L.Ed. ——:

"That Congress has wide discretion in the matter of prescribing details of expenditures for which it appropriates must, of course, be plain. Appropriation and other acts of Congress are replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies. A striking and pertinent example is afforded by the Act of June 17, 1902, c. 1093, 32 Stat. 388, where all moneys received from the sale and disposal of public lands in a large number of states and territories are set aside as a special fund to be expended for the reclamation of arid and semi-arid lands within those states and territories. The expenditures are to be made under the direction of the Secretary of the Interior upon such projects as he may determine to be practicable and advisable. The constitutionality of this delegation of authority has never been seriously questioned. See United States v. Hanson (C.C.A.) 167 F. 881, 884, 885."

### The Exercise of Power by the Administrator.

■ There can be no question but that the making by the Administrator of loans and grants to an enterprise of the character here involved is authorized by the statute. Section 201 of title 2 of the National Industrial Recovery Act, 48 Stat. 200 (40 U.S.C.A. § 401), authorizes the President to appoint an Administrator of Public Works, and section 202 (40 U.S.C.A. § 402) requires that the Administrator, under the direction of the President, shall prepare a comprehensive program of public works, including construction of publicly owned instrumentalities, development of water power and transmission of electrical energy, and any projects of the character heretofore constructed

or carried on either directly by public authority or with public aid to serve the interests of the general public. A municipal power plant falls squarely within all three of these classes; and, if there were otherwise any doubt about the matter, the subsequent legislation to which we have referred, enacted with full knowledge on the part of Congress of the program prepared by the Administrator and of the fact that it included the project here under consideration as well as a number of other non-federal power projects, would remove every basis of controversy with respect thereto. The Administrator, then, is acting within the express authority of the statute when he makes a grant or loan to a municipal power plant such as we have here.

The contention of the plaintiff is that the action of the Administrator in making such a loan and grant should be enjoined on the ground that, in making same, he is actuated by the motive of reducing power rates and that, in any event, the construction of the project made possible thereby will have that effect. There are several answers to this, each of which seems to us to be complete and final.

In the first place, the court below has found, and the finding is supported by evidence, that the Administrator was not actuated by such motive in making the loan and grant to the county; that the Administrator will have no power to coerce or control the action of the county in the matter of rates; that any effect which the construction of the project will have on the rates will be the result of competition which the county will voluntarily enter into; and that on account of differences in cost, overhead, taxes, etc., the project will not provide a criterion for the fixing of rates of private enterprises. The contention of plaintiff, therefore, as to the motive in the making of the loan and grant here involved, must fail on the facts.

In the second place, the Administrator in selecting projects to which loans and grants are to be made under the statute must necessarily exercise an administrative discretion, so as to extend aid to projects which are financially sound and the construction of which will be in the public interest. If, in exercising this discretion, he adopts the policy of not making loans and grants for municipal projects which will not provide rates to the public lower than competing private enterprises, such policy would seem to accord both with sound finance and with the requirements of justice to existing enterprises. Certainly, a municipal enterprise would have small chance of success if its rates were above those of an existing private utility; and it would not be fair to such utility to encumber the field with a competing enterprise when it was furnishing current to the public as cheaply as such competitor could furnish it. There is nothing in law or common sense which requires the Administrator to ignore such considerations in the exercise of the discretion reposed in him. Congress could certainly have provided that no loans or grants should be made under the act to a municipal enterprise in cases where an existing private enterprise was furnishing service to the public as cheaply as the municipal enterprise would furnish it; and we see no reason why such criterion may not and should not be adopted by the Administrator. He is not required to select the projects on his program by lot or to close his eyes to the interests of the public or the social desirability of projects among which he must choose. Few projects would seem to have greater social desirability than those which will result in the utilization of undeveloped natural resources and will help supply the rapidly increasing demand for electric power; and we cannot see that it is a valid objection to the selection of such projects that the competition which will be engendered by them may result in the lowering of electric power rates to the public.

In the third place, even if the Administrator have the motive attributed to him by plaintiff, and even if this be an improper motive, the validity of his action is not affected thereby. Equity will restrain where there is lack of power on the part of a public officer, not where there is mere abuse of power in doing from a wrong motive or to accomplish an ulterior purpose that which the law authorizes. To grant injunction in the latter case would be for the courts to control the executive in the exercise of executive discretion, a thing which under our tripartate form of government they have no power to do. Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 57 S.Ct. 407, 410, 81 L.Ed. 562; Dakota Central Telephone Company v. South Dakota, 250 U.S. 163, 184, 39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623; Louisiana v. McAdoo, 234 U.S. 627, 633, 34 S.Ct. 938, 58 L.Ed. 1506; Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570; Ferris v. Wilbur (C.C.A.4th) 27 F.(2d) 262, 264; Appalachian Electric Power Company v. Smith (C.C.A.4th) 67 F.(2d) 451, 454. In the case last cited, there were allegations in the bill as to abuse of authority

by the members of the Federal Power Commission, as well as allegation with respect to action without authority. In refusing to consider the allegations as to abuse of authority, we said:

"The allegations and prayers of the bill which relate to abuse of authority by the commission need not be considered; for it is clear that it is only on the allegations of want of statutory or constitutional authority that the suit against the commissioners as individuals could under any theory be sustained."

The question was squarely before the Supreme Court in Dakota Central Tel. Co. v. South Dakota, supra, 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623, which involved the taking over of the telephone companies by the President under a statute enacted under the war power. It was argued that the action of the President was an abuse of the discretion vested in him as the war had virtually ended and the action taken was not for the purpose of prosecuting the war but for regulating telephone rates. See argument 250 U.S. at page 177. In disposing of this contention the Court, speaking through Chief Justice White, said (250 U.S. 163, at page 184, 39 S.Ct. 507, 509, 63 L.Ed. 910, 4 A.L.R. 1623):

"The proposition that the President in exercising the power exceeded the authority given him is based upon two considerations: First, because there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority; indeed, the contention goes further and assails the motives which it is asserted induced the exercise of the power. But as the contention at best concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. *This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive department so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.*" (Italics ours.)

The fact that the competition which will result from the project may have some effect upon plaintiff's rates cannot affect the validity of the action of the Administrator any more than his motives. It is true, of course, that neither Congress nor the Administrator may do something which they are forbidden to do by calling it something else; but the exercise of a granted power is not rendered unlawful by reason of its incidental effects. Sonzinsky v. United States, 300 U.S. 506, 57 S.Ct. 554, 556, 81 L.Ed. 772; Magnano Co. v. Hamilton, 292 U.S. 40, 44–47, 54 S.Ct. 599, 601, 602, 78 L.Ed. 1109.

## Plaintiff's Right to Relief.

As we pointed out in our former opinion [81 F.(2d) 986, at pages 997–999], plaintitff is not entitled to the injunction which it asks, irrespective of the constitutionality of the statute or the authority of the Administrator, for the reason that none of its rights is infringed by the making of the loan and grant. Plaintiff argues that the remanding of the case by the Supreme Court amounted to a decision of this point in its favor; but that court expressly declined to express any opinion on the merits and, in the absence of an express holding by it to the contrary, we are of opinion that our former holding with respect to this matter was correct. It is elementary that before a party is entitled to injunctive relief it must appear that some right of his is threatened with invasion by the action of which he complains. United Fuel Gas Co. v. Railroad Comm., 278 U.S. 300, 310, 49 S.Ct. 150, 152, 73 L.Ed. 390. Now, the action complained of is the making of the loan and grant to the county out of the funds of the United States. While some state courts recognize the right of a taxpayer to enjoin the unauthorized use of public funds, it is well settled in the federal courts that such use of the funds of the United States violates no right of the taxpayer of which he may complain. Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. Plaintiff contends, however, that the lending of such funds to the county in order that it may engage in competition with plaintiff violates its rights; but the answer to this is that competition by the county violates no rights of plaintiff. Puget Sound Power & Light Co. v. Seattle, 291 U. S. 619, 54 S.Ct. 542, 78 L.Ed. 1025; Madera Waterworks v. Madera, 228 U.S. 454, 33 S. Ct. 571, 57 L.Ed. 915. It is true that grounds for relief may exist against action innocent in itself if taken to enable another to violate rights of complainant; but we know of no principle upon which action which violates no right may be enjoined because in aid of another action which violates no right.

It is said that every person engaged in business which is subject only to state control has the right to pursue that business

free from the regulation of the federal government. This is true; but the federal government here is not attempting regulation of plaintiff's business. It is merely making a loan and grant to a county which proposes to engage in a competing business, as such county has a right to do; and it is well settled that an act which is unauthorized, but which infringes no right of another, may not be enjoined merely because it will enable a third person to enter into competition with that other. New Orleans, M. & T. R. Co. v. Ellerman, 105 U.S. 166, 174, 26 L.Ed. 1015; U. S. ex rel. v. Dern, 63 App. D.C. 28, 68 F.(2d) 773; Keen v. Mayor & Council of Waycross, 101 Ga. 588, 29 S.E. 42; Milwaukee Horse & Cow Comm. Co. v. Hill, 207 Wis. 420, 241 N.W. 364, 369.

A case very much in point is the Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667. That suit was brought to enjoin an order of the Interstate Commerce Commission which authorized a competing railroad to acquire certain terminals, an action which would result in loss of business to complainant. A majority of the court held that complainant had standing to challenge the order, but only because of provisions of the Transportation Act of 1920 (41 Stat. 456). The minority dissented on the ground that that statute was not applicable; but the doctrine that in the absence of that statute, complainant would have had no standing, because none of its rights was invaded, was accepted by the entire court. In Sprunt & Son v. United States, 281 U. S. 249, 254, 50 S.Ct. 315, 317, 74 L.Ed. 832, it was held that a shipper had no standing to challenge an order of the Commission which eliminated a rate differential that gave the shipper an advantage over competitors, because such order violated no right of the shipper although resulting in economic loss to him. To the same effect is the decision in Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 148, 44 S.Ct. 72, 73, 68 L.Ed. 216.

In passing upon this question, we must not lose sight of the fact that the suit before us is one against the Administrator in his individual capacity to enjoin him from action alleged to infringe the rights of plaintiff. The question of authority on his part becomes material only where it appears that a right of plaintiff will be infringed by his proposed action. If such right is infringed, authority of a valid law will justify action which would otherwise not be justified; but, if no right is infringed, authority or lack of authority is immaterial.

The proposed action of the Administrator of which complaint is made is the making of the loan and grant to the county. No one will contend that if such loan and grant were to be made by the Administrator from his own funds or from the funds of a private person, plaintiff would have any standing to enjoin it; and we cannot see that the source of the funds can affect the question of invasion of rights, where plaintiff has no such interest in the funds as it could protect by injunction. Frothingham v. Mellon, supra.

The question here under consideration has arisen in a number of cases involving loans and grants by the Administrator of Public Works, and in all of them the decision has been in accord with the views which we have expressed. See Alabama Power Co. v. Ickes (App.D.C.) 91 F.(2d) 303; Arkansas-Missouri Power Co. v. Kennett (C.C.A.8th) 78 F.(2d) 911; City of Allegan v. Consumers' Power Co. (C.C.A. 6th) 71 F.(2d) 477; Kansas Utilities Co. v. City of Burlington, 141 Kan. 926, 44 P. (2d) 223.

### The Question of Costs.

The action of the court below in taxing one-half of the costs against the defendant was based upon the fact that the defendant county and the members of its finance board resisted the application for plaintiff to intervene in the case of Park v. Greenwood County when that case was pending before the Supreme Court of South Carolina. In this we think there was error. The Supreme Court of South Carolina held, and we must assume properly, that the plaintiff had no right to intervene in that case. We have decided here, not only that the statute complained of was constitutional and that the action of the Administrator of Public Works was authorized thereunder, but also that no right of plaintiff was invaded by the proposed action of the Administrator which would give it any standing in court to contest his action. Under such circumstances we can perceive no reason why plaintiff should not be taxed with the full cost of the litigation or why the defendants should be penalized with taxation of any part of the costs for defending it. Certainly, the opposition of defendants to the intervention of plaintiff in a suit in which it had no right to intervene is no sufficient reason for such taxation, and particularly is this true of the defendant Ickes who was not a party to the action in the state court and is not shown to have had

anything to do with the resistance offered to plaintiff's motion.

██ Ordinarily, it is true, the taxation of costs in an equity suit is a matter resting in the sound discretion of the trial court and its action with respect thereto will not be reviewed on appeal; but this discretion is to be exercised "not arbitrarily, but with reference to the general principles of equity and special circumstances of each case." Kell v. Trenchard (C.C.A.4th) 146 F. 245, 247. And where, as here, the entire decree and the proceedings of the lower court are before us, it is proper for us to consider whether the discretion was properly exercised. Citizens Bank v. Cannon, 164 U. S. 319, 323, 17 S.Ct. 89, 41 L.Ed. 451; The Scotland, 118 U.S. 507, 519, 6 S.Ct. 1174, 30 L.Ed. 153; Trustees of Internal Improv. Fund v. Greenough, 105 U.S. 527, 26 L.Ed. 1157. Under the circumstances here, we think there was no ground for taxing any part of the costs against defendants and that, as to that feature, the decree appealed from should be reversed.

The decree appealed from will accordingly be affirmed except as to the taxation of costs against the defendants, as to which it will be reversed.

SOPER, Circuit Judge (dissenting).

The conclusion of fact was reached, in the prior dissent in this case [Greenwood County v. Duke Power Co. (C.C.A.) 81 F. (2d) 986, 999], that the Federal Administrator of Public Works had assumed the authority to reduce the rates for electric energy charged by private corporations engaged in intrastate business, and that he had accomplished this purpose through his control of federal funds distributable under the provisions of title 2 of the National Industrial Recovery Act (40 U.S.C.A. § 401 et seq.). The conclusion was supported by reference to the public utterances of the Administrator in which he condemned as exorbitant the prices charged by utility companies in general, and the Duke Power Company in particular, and described his practice in cooperating with municipalities in the grant or refusal of federal funds to establish municipal plants so as to achieve the desired end. He announced that his policy had caused utility companies to adjust their rates downward in wide areas.

With regard to the project of Greenwood County, the evidence showed that an investigation of the rates charged by the Duke Power Company in the area concerned was made by the Public Works Administration, and that the rates were considered to be excessive; and that the application of Greenwood County for federal funds to establish a competing plant was approved because the lower rates which it proposed to charge had been investigated by the Administrator and found to be reasonable and satisfactory. In furtherance of the policy of the Administrator, a provision was inserted in the first loan and grant agreement with Greenwood County that the Government should be under no obligation to advance the necessary money unless a resolution should have been adopted by the county providing for rates to be charged by it for electric energy satisfactory to the Administrator. Such rates were in fact promulgated by the County. The South Carolina Revenue Bond Act of 1933, Act No. 299 (38 St. at Large p. 411), provided in section 21 that rates for services to be furnished by such a municipal plant should be fixed precedent to the issuance of bonds; section 29 provided that such rates should not be subject to the supervision or regulation of any state commission or like instrumentality or agency, and Act No. 1095 of the South Carolina Statutes at Large, 1934, volume 38, p. 2020, authorizing Greenwood County to borrow from the Public Works Commission the money to construct the plant, declared that the project was self liquidating and that any indebtedness created therefor should not be a direct and primary obligation of the county.

The additional evidence taken upon the last trial in the District Court strongly supports the same conclusion. The administrator set up an agency known as the Electric Power Board of Review which from 1933 to March 16, 1935, had charge in an advisory capacity of the applications of municipalities desiring to establish electric power plants. During this period the loan and grant to Greenwood County was approved. The policy announced by members of this body and applied in numerous instances was precisely in accord with the Administrator's plans, and this course was followed not only when a proposal involving revenue bonds was under consideration, but also when general obligation bonds were offered by the municipality. The procedure was to give the established private power company an opportunity to put into effect a rate equal to or lower than the proposed municipal rate, and if this was done, the application of the municipality would be rejected unless it proposed a still lower

rate, in which event, the utility was given another opportunity to make a further reduction. The controlling consideration in the establishment of competing plants was the matter of rates and the test applied was that such plants would be established only when the rates would serve as a yardstick to promote the policy of the Public Works Administration to bring about a general reduction of electric power rates.

It is true that since the decision of Judge Watkins in the court below (D.C.) 10 F. Supp. 854, (D.C.) 12 F.Supp. 70, and the decision in Arkansas-Missouri Power Co. v. City of Kennett (C.C.A.) 78 F.(2d) 911, which pointed out the illegality involved in the practices of the Administrator, an attempt has been made to repudiate the public statements concerning the policies of the Administration which had been frequently and publicly made by subordinate officials; but these statements conformed so closely to the announcements of the Administrator that the attempt to abandon them amounts to little more than an expression of regret that what had been so widely proclaimed as a praiseworthy public policy had become a source of danger to the establishment of municipal power projects. The District Judge found that there was in fact a change in the policy of the Administrator after he became doubtful of the validity of his prior acts, but so far as the proposal of Greenwood County is concerned, there was no change that affects the finding of fact that it was approved because it met the requirement that it would bring down the rates of the established local utility. The original contract of December 8, 1934, was revised on November 30, 1935, so as to include a paragraph denying to the Administrator and the Government the right or power to govern the rates to be fixed or charged for the services afforded by the project, excepting such rights as the Government might have as a holder of the municipal revenue bonds; but no new application for the loan and grant was made by the county, no new resolution of approval of the project by the Public Works Administration was given, and no change was made in the rates to be charged by the projected plant which had been adopted prior to the execution of the first contract and had received the approval of the Administrator. In fact, the county adopted a new resolution on December 6, 1935, by which the original rates were confirmed. The change in the contract was obviously made to meet, if possible, the legal objection that had been raised; but no

change was made in the unauthorized and invalid condition upon which the proposal had been approved.

It is of course conceded that in the consideration of a project for approval the Administrator must necessarily exercise an executive discretion and may properly take into account the question of rates in determining whether a proposed municipal power project will have a reasonable prospect of success. It is claimed on behalf of the Government that such was the extent of his action in this case. But the evidence is to the contrary. Possessing the conviction that the rates approved by state authority were too high, he determined to use his power as an official of the national government to reduce them; and in carrying his purpose into effect he stepped across the line, went beyond the power conferred upon him by Congress and invaded the reserved powers of the states. If the National Industrial Recovery Act had provided that the power of the Administrator to make loans or grants to municipalities for the establishment of power plants should be exercised so as to reduce by competition the rates of private utilities approved by state authority, such a provision would surely have been unconstitutional. The Administrator proceeded as if such a provision were contained in the statute. The consent of the state in this instance does not save the situation because "state powers can neither be appropriated on the one hand nor abdicated on the other." Carter v. Carter Coal Co., 298 U.S. 238, 295, 296, 56 S.Ct. 855, 866, 80 L.Ed. 1160.

We are not concerned here merely with the manifestations of an improper motive in the course of the exercise of a lawful power. We are confronted by the exercise of power not authorized by statute nor within the limitations of the Federal Constitution in pursuance of a policy publicly announced. The actions of the Administrator in this respect are of the same nature as the official conduct condemned in Anchor Coal Co. v. United States (D.C.) 25 F.(2d) 462; see, also, Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570.

When these conclusions are reached, there is seen to be no substance in the argument that no right of the Power Company has been infringed and hence it is not entitled to an injunction. It has indeed no right to be shielded from lawful competition by the county or any other producer of elec-

tric power. Puget Sound Power & Light Co. v. Seattle, 291 U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025; Madera Waterworks v. Madera, 228 U.S. 454, 33 S.Ct. 571, 57 L.Ed. 915. But it is entitled to relief against illegal competition which originates and is made effective through an agreement entered into in violation of the law of the land. City of Campbell v. Arkansas-Missouri Power Co. (C.C.A.) 55 F.(2d) 560; Frost v. Corporation Commission of Oklahoma, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483. There is of course no parallel between the substantial loss of revenue which the Power Company would suffer as the result of the operation of the municipal plant and the injury to a federal taxpayer from an improper expenditure of federal funds which was held too insignificant to form the basis of a suit in Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078.